800 So.2d 679 (2001)
David CALLAHAN, Petitioner,
v.
DEPARTMENT OF REVENUE, o/b/o Kathleen ROBERTS, Respondent.
No. 5D01-1733.
District Court of Appeal of Florida, Fifth District.
November 30, 2001.
Thomas W. Deans of Law Offices of Thomas W. Deans, P.A., Melbourne, for Petitioner.
Robert A. Butterworth, Attorney General, Tallahassee, and Jon J. Johnson, Assistant Attorney General, Tampa, for Respondent.
SHARP, W., J.
David Callahan, petitioner, seeks certiorari review of an order of the circuit court requiring him to submit to a DNA paternity test to establish his biological paternity of A.R., a two-year-old child, and his concomitant *680 duty to pay child support. The Florida Department of Revenue brought this proceeding pursuant to the Uniform Interstate Family Support Act,[1] at the request of the State of Arkansas, which has been paying various forms of welfare to A.R.'s mother, Kathleen Roberts, a resident of Arkansas, on behalf of the child. We grant the petition and quash the order requiring DNA tests.
Department of Health and Rehabilitative Services v. Privette, 617 So.2d 305 (Fla.1993) established the strong Florida public policy that in a case similar to this one, DNA tests to establish that a man other than the legal father of a child is the biological father will not be ordered unless the court determines that it is in the best interest of the child. In this case, the trial court did not make that determination, nor would the record support such a finding.
The facts in this case are unique but all such cases have their own distinctiveness and infinite variation. In February 1998, the mother of A.R. and David Roberts sought a divorce in Florida. They had four children, ages ranging from ten to two. The divorce was final at the end of April 1998. A.R. was apparently conceived in April of 1998.
Kathleen Roberts and the children relocated to Arkansas. Approximately one month before A.R. was born, Kathleen remarried David Roberts. They are currently living as an intact family, together with their children and A.R. Both Kathleen and David understand that A.R. is not David's biological child, but according to the guardian ad litem's report, David considers her to be one of his own and loves her as much as the others. His name is on her birth certificate. Kathleen Roberts works part time, earning $400.00 per month. She home-schools the children and they are well cared for, healthy and happy.
Also, according to the guardian ad litem's report, Callahan admits he may be the biological father of A.R., but he wants no involvement with her in any way. Currently he is unemployed. He is being supported by his wife, an adult daughter, and a son who plays professional baseball. He has no desire or intent to be a father to A.R.
The guardian at litem strongly recommended against allowing the DNA test to go forward, based on the best interest of the child. Initially, the trial court denied the motion for DNA testing, based on the guardian's report, but stated that it might allow the test to proceed, if the legal father were notified and advised of the fact his parental rights could be terminated, and if he did not object.
The Department then renewed its motion for DNA testing, based on a letter allegedly signed by both the Roberts, in which they said:
[W]e understand that since David Callahan is the father of [A.R.], David Roberts has no legal rights to her. This would be the case whether Mr. Callahan pays child support or not since he is her biological father. Since he is her biological father, we would expect that he also should share some degree of responsibility by paying child support and expect that this be pursued. If he is man enough to father a child then he should be man enough to take responsibility for his actions. We have cooperated in every way with everything that has been requested of us. He has not done anything requested of him and manages to avoid the situation entirely. This is unfair to [A.,R.] and should not be acceptable to any judge who handles this case. *681 The fact that we are now married should have no bearing on this case since we are not requesting spousal support. She is his child regardless of marital status.
Based on this letter, the court ruled that Privette had been satisfied. It determined that the legal father had consented to having his parental rights terminated. And further, it said, there is no good reason, if Callahan indeed tests out as the biological father, that he should not assume the status as legal father of A.R., and become obligated to pay child support.
In Privette, the Florida Supreme Court expressed concern and intent to protect the parental rights of a legal father, even if there were a biological father in the picture, where it was in the best interest of the child. That case was remanded to make a "best-interest" determination, and to allow the legal father the opportunity to participate in the proceedings. It appeared the legal father had abandoned the mother and she was living in poverty. Thus, the court concluded, that might be a case in which the status of legal fatherhood should be overturned.
In this case, A.R. has been accepted as one of the legal father's own children. She is living with him in an intact family situation, and has no relationship with the putative biological father, Callahan. And, Callahan has absolutely no interest in establishing any kind of a relationship with A.R. The only interest being furthered here is that of the State of Arkansas in recouping welfare funds being expended on A.R. In Privette, the supreme court made it clear that is not a sufficient basis to challenge the status of a legal father. Further, in G.F.C. v. S.G., 686 So.2d 1382 (Fla. 5th DCA 1997), we held in a paternity suit brought by the biological father, that mere biology was also not a sufficient basis to disrupt an intact family. Pertinent considerations should relate to the best interest of the child. See Fernandez v. McKenney, 776 So.2d 1118 (Fla. 5th DCA 2001) (Sharp, W., J., concurring specially).
There is another line of cases that allows a legal father who doubts his paternity of a child born in a marital relationship, to establish that he is not the biological father of the child and thereby escape any child support obligations or responsibilities for the child.[2] These cases are difficult to reconcile with Privette, et al., in some regards, but the key uniting factor is that the man who is the legal father initiates the cause of action, and the social policy that his right not to be burdened with a child who is not his, trumps the child's best interests.
That does not appear to be the case here. David Roberts did not file this action seeking to be relieved of his status of being A.R.'s legal father. The letter filed in the record may lend itself to that interpretation, but it also can be read to indicate that Roberts has no conception about his status as a legal father, and his right to preserve that relationship with A.R. Further the letter is totally in conflict with the report of the guardian ad litem, and suspect in its authenticity. It does not address the key issue here, which is the best interest of A.R.[3]
*682 Petition for Writ of Certiorari GRANTED.
SAWAYA, J., concurs.
COBB, J., concurs specially with opinion.
COBB, J., concurring specially.
The action of the trial court in this case is in direct conflict with the rationale of the Florida Supreme Court in Department of Health and Rehabilitative Services v. Privette, 617 So.2d 305 (Fla.1993).
David Roberts is not only the legal father of A.R. but also her acting father in an intact family in Arkansas. According to the report of the guardian ad litem, Roberts considers A.R. as his own child, along with other siblings. The children are well-cared for, healthy, happy, and loved by both parents. On the other hand, the petitioner, Callahan, from whom the Department is seeking reimbursement, is unemployed and wants nothing to do with A.R. The letter submitted (and possibly authored) by the Department wherein Roberts supposedly waives his parental rights is unpersuasive. Not only is it unsworn, it is based upon a patently erroneous premise: that a legal father has no rights to his child unless he is also the biological father. Clearly, that is not the law.
The supreme court in Privette stated that the court, in order to justify DNA testing, must find by clear and convincing evidence that it is in the best interests of the child to disturb the child's legitimacy. The Privette decision made it clear that "once children are born legitimate they have the right to maintain that status both factually and legally if doing so in their best interests." There must be clear and convincing reasons based primarily on the child's best interests to overcome the presumption of legitimacy even after the legal father is proven not to be the biological father. Privette, 617 So.2d at 309.
The administrative determination from the Arkansas court did not alter the legal status of David Roberts as the legal father of the minor child. The guardian ad litem's report indicated that the minor child has a positive relationship with David Roberts, whom she considers her father, and has a positive relationship with her four brothers and sisters, the other children of David and Kathleen Roberts. The supreme court in Privette stated that a court cannot grant a blood test merely because a state agency wants reimbursement. Privette, 617 So.2d at 309-310. This case must be determined by Florida law, not Arkansas law, particularly when the latter contravenes our public policy.
Privette is the controlling case on this issue. There, the mother was married to a man who was not the biological father of her daughter, but he was listed as the father on the child's birth certificate. The putative biological father, Privette, was the defendant in an HRS suit brought on behalf of the mother, and HRS was seeking reimbursement for public funds spent on behalf of the child. The trial judge ordered DNA testing for reasons not made clear, but presumably on the basis that the test was warranted by HRS' financial interests. The district court quashed the order requiring testing, and the supreme court approved that decision.
The Department cites another supreme court case, Daniel v. Daniel, 695 So.2d 1253 (Fla.1997), to support its position. In that case, the supreme court held that a former husband had no duty to pay child support after his marriage was dissolved where the parties had stipulated that the *683 husband was not the biological father of the child. The supreme court distinguished Daniel from Privette; it noted that Privette addressed a case of contested paternity involving blood tests. Its application would be limited to those instances where a child faces the threat of being declared illegitimate and the "legal father" also faces the threat of losing parental rights which he seeks to maintain. The one similarity between the instant case and Daniel is that both Kathleen Roberts and David Roberts stipulate that David Roberts is not the biological father, and that David Callahan has acknowledged that mostly likely he is the biological father.
In Daniel the court noted that paternity and legitimacy are different concepts. Legitimacy means being born to legally married parents, while paternity recognizes that only one person can be the biological father of a child. The court stated that paternity and legitimacy are related, but are nonetheless separate and distinct concepts. Noting that the child's legitimacy in that case would not be affected by determination of paternity or any orders of support that may follow such a determination, the court approved the Second District Court of Appeal's decision which reversed that part of the final judgment of dissolution of marriage which ordered the husband to pay child support.
The instant case is more akin to Privette, which centered on litigation brought by a state agency seeking to compel a putative father to pay child support. Like Privette, the instant case involves a paternity action and a request for blood tests, while in Daniel no paternity action or blood tests were involved; the issue involved the husband's support obligation in a final judgment of dissolution of marriage.
The Department in the instant case argues that Daniel is more closely on point than Privette because in this case the husband and wife have stipulated that the husband is not the biological father of A.R. However, Daniel did not involve an intact family, but a family that was going through divorce. The child in Daniel was born three months after the couple married, and the couple separated after only 11 months of marriage. In the instant case the family is intact, but the Department of Revenue is seeking an order establishing that another individual, David Callahan, is the biological father of the minor child. If David Callahan is declared to be the biological father as a result of this action, he could at some future point petition the court in the appropriate jurisdiction for custody, visitation, and shared parental responsibility rights. This is directly contrary to the recommendation of the guardian ad litem, who recognized that such an intrusion could harm the family and is not in the best interests of the minor child. It is also contrary to common sense.
Although the supreme court noted in Daniel that legitimacy and paternity are interrelated but distinct concepts, the result of the interplay between these concepts is different in the instant case. The husband in Daniel was not asserting any rights he might have had as the child's "legal father" during the time of the couple's marriage. In the instant case, David Roberts told the guardian ad litem that he considered himself the legal father of the child and asserted his rights as legal father, while admitting that he is not the biological father. The subsequent letter signed by Kathleen and David Roberts, in which they relinquish any rights that the husband has as legal father of the minor child, is suspicious in nature as it is contrary to the husband's thoughts and feelings expressed in the interview with the guardian ad litem. It is unknown whether the husband consulted with an attorney before making such an important declaration. Even despite this apparent "about *684 face" on the part of the legal father, it still must be determined whether it is in the child's best interests to relinquish the husband's legal rights as father of A.R., the man she considers her father and with whom she has bonded, in favor of a man that is a stranger to her and evinces no interest in her.
The trial judge, in ordering the DNA test, did not state that this course was in the child's best interests. She ordered the DNA testing because the legal father had received notice, and because the putative father, in her view, should not be excused from his support obligations. In this situation, the trial court departed from the essential requirements of law in continuing the paternity action and in compelling the putative biological father to undergo a DNA paternity test. Privette strongly holds that the goal of requiring a putative father to meet his financial obligations is not a valid or sufficient reason to continue a paternity action when a child already has a legal father. 617 So.2d at 307. The one unsworn letter wherein the husband purportedly waives his rights as legal father of A.R. is not clear and convincing evidence that the child's best interests would be served by proceeding with the paternity action.
NOTES
[1] Ch. 88, Fla. Stat. (2000).
[2] See Daniel v. Daniel, 695 So.2d 1253 (Fla. 1997); Lefler v. Lefler, 722 So.2d 941 (Fla. 4th DCA 1998); Gantt v. Gantt, 716 So.2d 846 (Fla. 4th DCA 1998).
[3] A further complication in this case is what affect Arkansas law may have on this family relationship, since A.R. and her family now reside there. All we can do is uphold the strong public policy of Florida enunciated by Privette. In a reverse situation, had Callahan sought to establish his paternity status as legal father of A.R., assuming A.R. and family were living in this state, his lawsuit would be dismissed. See G.F.C. v. S.G., 686 So.2d 1382 (Fla. 5th DCA 1997).