**Jack Leon IPOCK, Appellant**

v.

**Dana Rene IPOCK, Cabinet for Health and Family Services, Commonwealth of Kentucky and E.E.I., a Child, Appellees.**

No. 2012–CA–001271–ME.

Court of Appeals of Kentucky.

July 5, 2013.

Christy H. Shircliff, Louisville, KY, for Appellant.

Kelli Cross Fisher, Somerset, KY, for Appellees.

Before CAPERTON; MAZE and VANMETER, Judges.

## OPINION

MAZE, Judge:

Appellant, Jack Ipock (hereinafter "Jack"), appeals the Casey Circuit Court's order allowing Appellees, the Cabinet for Health and Family Services ("CHFS") and E.E.I.'s guardian *ad litem,* Judy Vance ("Vance"), to intervene in his suit for divorce from Appellee, Dana Ipock (hereinafter "Dana"). Jack further appeals the trial court's decision vacating its prior order regarding paternity and custody of E.E.I., Dana's minor child. While we find that the trial court abused its discretion in finding fraud as a basis for its decision, we affirm the result and the trial court's ruling permitting CHFS and Vance to intervene and amending the divorce order in light of Jack's exclusion as E.E.I.'s father. Therefore, we affirm.

## Background

Jack and Dana's child, E.E.I., was born on February 18, 2011. Less than a month later, the couple was married and, on April 5, 2011, both signed a Declaration of Paternity which was then filed with Kentucky's Bureau of Vital Statistics. On August 19, 2011, CHFS filed a petition alleging neglect of E.E.I. by Jack and requested removal of E.E.I. from Jack's custody. Removal was granted and E.E.I. entered the custody of CHFS. Two days after the petition was filed, Jack and Dana separated and a month later, Jack sued for divorce, affirming in his Verified Petition that he was E.E.I.'s father and requesting sole custody of her. On October 13, 2011, Jack and Dana entered into a Separation Agreement and Property Rights Settlement, which stipulated, among other things, that though E.E.I. was in CHFS's custody, upon reunification, Jack and Dana would enjoy joint custody and E.E.I. would primarily reside with Jack. The trial court entered its findings and incorporated this agreement into its decree on January 9, 2012.

During the pendency of the neglect case, Dana made statements regarding paternity of E.E.I. which led the county attorney to request that Jack take a paternity test. Jack agreed and the results of the March 7, 2012, test proved Jack not to be E.E.I.'s father. As a result, CHFS ceased its efforts in the neglect case to reunify E.E.I. with Jack and the county attorney asked the District Court in Casey County to overrule the Circuit Court's decree in the divorce action. The District Court declined to do so. On May 18, 2012, CHFS and Vance filed a Motion to Intervene in the divorce case under Kentucky Rules of Civil Procedure, CR 24.01 and 24.02, as well as a Motion to Alter, Amend or Vacate the Agreement pursuant to CR 60.02. Vance and CHFS argued on the latter issue that the result of the paternity test constituted "newly discovered evidence." Attached to the motion was a copy of DNA results, the signed Declaration of Paternity and a copy of "Brief In Support of Jack L. Ipock's Claim To Have Standing In The

Current Action," in which Jack had previously pled the following:

> After Jack and Dana's final Agreement of Dissolution was entered and the District Court ordered a paternity test Jack revealed to his attorney that Dana previously disclosed to him that it was a remote possibility that he was not the biological father of [E.E.I.]. Jack has always had constructive knowledge that he may not be the father of [E.E.I.] and has never been misled or told otherwise by Dana.

CHFS and Vance argued in their motion that the latter showed that Jack and Dana had defrauded them regarding Jack's relation to E.E.I., forming the basis for altering the custody order. In responding to the motion, Jack argued that there was an insufficient basis for permitting Vance and CHFS to intervene or for altering the Agreement, and he further denied any fraudulent acts on his part. Jack further pled "paternity by estoppel" as a basis for retaining custody of E.E.I.

The trial court granted the Motion to Intervene. The trial court also rejected Jack's claim of "paternity by estoppel" and amended its decree to reflect that Jack was not E.E.I.'s father. The trial court also vacated the Agreement's grant of custody to Jack. In doing so, the trial court found that the paternity test constituted both evidence which was newly discovered and which showed Jack and Dana had committed fraud. This appeal follows.

## Standards of Review

■ Jack challenges the trial court's orders regarding both a motion to intervene and a motion to alter, amend or vacate its prior decision regarding custody. Accordingly, we review the trial court's order related to intervention for clear error. *Carter v. Smith,* 170 S.W.3d 402, 409 (Ky.App.2004). "Under this standard, this Court will only set aside the findings of fact of the trial court if those findings are clearly erroneous." *Cardiovascular Specialists, PSC v. Xenopoulos,* 328 S.W.3d 215, 217 (Ky.App.2010); *See also* CR 52.01. "The dispositive question is whether the findings are supported by substantial evidence." *Id.* In general, a court is given broad discretion in determining whether or not one should be permitted to intervene. *See Allen Calculators v. National Cash Register Co.,* 322 U.S. 771, 64 S.Ct. 1257, 88 L.Ed. 1596 (1944).

■ However, the denial of a motion to alter, amend or vacate is subject to the abuse of discretion standard. *See William C. Eriksen, PSC v. Kentucky Farm Bureau Mutual Ins. Co.,* 336 S.W.3d 909, 911 (Ky.App.2010). Thus, it must be determined whether the trial court's decision was " 'arbitrary, unreasonable, unfair or unsupported by sound legal principles.' " *Miller v. Eldridge,* 146 S.W.3d 909, 914 (Ky.2004) (*quoting Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky.2000)). While reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly, *see Gullion v. Gullion,* 163 S.W.3d 888 (Ky.2005), an appellate court should affirm the trial court unless there has been an abuse of discretion resulting in a "flagrant miscarriage of justice." *Gross v. Commonwealth,* 648 S.W.2d 853, 858 (Ky. 1983).

## Analysis

### I. Vance's and CHFS's Right to Intervene

A party may intervene under two procedural scenarios. CR 24.01 permits intervention under two circumstances:

> (1) ... (a) [W]hen a statute confers an unconditional right to intervene, or (b) when the applicant claims an in-

terest relating to the property or transaction which is the subject of the action and is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless that interest is adequately represented by existing parties.

In the alternative, CR 24.02 allows intervention upon a party's timely application and

(a) when a statute confers a conditional right to intervene or (b) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

CR 24.02(2). This second of the two joinder rules dispenses with any requirement that the intervenor shall have a direct personal or pecuniary interest in the subject of the litigation. *Securities & Exchange Comm'n v. U.S. Realty Improvement Co.,* 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).

### A. CHFS's Right to Intervene

The trial court held that CHFS could intervene because it "has to determine whether [Jack] is to be part of the permanency plan. There are question[s] of law and fact in common between the two actions." In seeking our affirmation of that decision, CHFS argues that it, as the cus-todian of E.E.I., has an interest in knowing who E.E.I.'s father is. We agree. CHFS further argues that, pursuant to CR 24.01, the protection of this right would be impaired or impeded if they were not permitted to intervene in the divorce action. With this we must disagree.

The Agreement's provision regarding custody was clearly predicated on CHFS's action regarding Jack's contact with E.E.I. in the neglect case. While CHFS has an interest in knowing the identity of E.E.I.'s father, its inability to participate in the divorce case would not impair or impede those interests. CHFS's interests and goals are just as capable of being fully served and achieved in the neglect action against Jack. Therefore, substantial evidence did not exist which would permit CHFS to intervene as a matter of right.

■ We find, however, that the general language of CR 24.02, upon which the trial court seems to have ultimately based its decision, does permit CHFS to intervene in Jack and Dana's divorce action. Specifically regarding E.E.I., her custody and Jack's relation to her, the trial court correctly found that there are questions of law and fact in common between the divorce case and the neglect case. Therefore, the trial court did not err in permitting CHFS to intervene under CR 24.02.

### B. Vance's Right to Intervene

■ The trial court stated, very briefly, in its order, "the Guardian ad Litem of the child has standing to intervene as well under CR 24.02." Once again, we hold that the permissive language of that rule does allow Vance to intervene due to the overlapping questions of law and of fact regarding her client, E.E.I., and Jack's relation to, and custody of, her. While, like CHFS, Vance would not have standing under CR 24.01, and fails to establish a statutory right to intervention under CR

24.02(a), she did show that her claims fell within the general provisions of CR 24.02(b). Therefore, on the matter of Vance's intervention, the trial court did not err and we proceed to the question on appeal regarding the trial court's decision to amend the custody order in the divorce case on the motion from CHFS and Vance.

Finally, our finding that the trial court properly permitted CHFS and Vance to intervene in this case should not be taken as a blanket approval for all future such actions concerning CHFS's or a guardian *ad litem*'s request to intervene into private divorce cases. It is well established that the decision to permit a party to intervene is one made strictly on a case-by-case basis; and so it shall remain.

## II. Motion to Amend or Clarify the Agreement via CR 60.02

The trial court found two bases for granting the CR 60.02 motion: that the result of the paternity test constituted "newly found evidence" which justified the amendment of the decree and that Jack and Dana had perpetrated a fraud regarding Jack's relation to E.E.I. We elect to examine first the trial court's conclusion regarding fraud.

### A. Fraud

■ CR 60.02 states,

[o]n motion a court may, upon such terms as are just, relieve a party or his legal representative from its judgment, order, or proceeding upon the following grounds: (a) mistake, inadvertence, surprise or excusable neglect; (b) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59.02; (c) perjury or falsified evidence; (d) fraud affecting the proceedings, other than perjury or falsified evidence....

A party alleging fraud under CR 60.02(d) has the burden of proving, by clear and convincing evidence, that the opposing party's procurement of the court's prior order was achieved by fraud or deceit. *See Rice v. Dowell*, 322 S.W.2d 468 (Ky.1959). The moving party must essentially prove that the opposing party's conduct outside of the trial itself somehow prevented the moving party from appearing or presenting fully and fairly its side of the case. *See* 7 Ky. Prac. R. Civ. Proc. Ann. Rule 60.02 (6th ed.2012).

■ As a basis for their motion, CHFS and Vance argued that both Dana and Jack knew that Jack was not the father of E.E.I., and actively concealed that fact during both the divorce and neglect actions. They relied exclusively on the paternity test results and on Jack's memorandum in support of his standing which he submitted in April 2012. In that pleading, Jack stated, "[he] has known all along that it was a possibility he was not the father of E[.E.I.]." CHFS and Vance contend that, by continuing, despite this information, to claim to be E.E.I.'s father during the divorce and neglect cases, Jack perpetrated a fraud upon the court.

The trial court's conclusion regarding Jack's alleged fraud was unreasonable given the limited facts upon which its conclusion was based. The court stated in its opinion that "both parties knew that [Jack was not E.E.I.'s father]." However, this is a mischaracterization of the testimony in the record. Jack acknowledged that Dana had informed him of the "remote possibility that he was not the biological father of [E.E.I.]." Knowledge of a "remote possibility" is vastly different from the knowledge required to commit a fraud. While this may seem like a semantic distinction, but the distinction is real and it is too important to ignore considering the resulting critical change to Jack's rights under the Agreement.

Furthermore, this appeal concerns the trial court's order in the divorce case. Hence, it is worth noting that, even if Jack and Dana were actively concealing the material fact that Jack was not E.E.I.'s father, their actions could not have prevented CHFS or Vance "from appearing or presenting fully and fairly its side of the case" because they were not parties to the divorce action.

CHFS provided no evidence of the alleged fraud other than Jack's statement in his pleading and the result of the paternity test. The trial court's finding that Jack committed fraud, based on this alone, was clearly erroneous, and therefore an abuse of the court's discretion. The facts required for such a ruling simply do not exist in the record.

## B. Paternity Test as "Newly Discovered Evidence"

■ We also look to the trial court's decision to grant the CR 60.02 motion on the basis that the paternity test constituted "newly discovered evidence" under the rule. Jack argues that the paternity test has little or no effect on his status as E.E.I.'s legal father and, thus, that the trial court erred in granting the motion on this basis. In light of recent Supreme Court precedent, we must disagree.

Though the law surrounding CR 60.02 itself may be well established, its use in the context of the disestablishment of paternity is ever-evolving. Furthermore, the statutes which provide for both the reporting of a birth and the establishment of a child's paternity combine for what is, at times, confused guidance and have been the subject of much debate in our courts. KRS 406.025 states that parties may establish paternity voluntarily through a written, signed and notarized acknowledgement filed with the state Registrar of Vital Statistics. KRS 406.021(4) further states that such an acknowledgment creates a rebuttable presumption of the man's paternity. This presumption is rebuttable "for the earlier of sixty (60) days or the date of an administrative or judicial proceeding relating to the child, including a proceeding to establish a child support order following the date of signatures on the notarized affidavit." KRS 406.025(2). After the expiration of such a time, the alleged father who signed the voluntary acknowledgment of paternity is the presumed legal father of that child. Whether the resulting presumption is henceforth and completely irrebuttable is not clear from the statute itself.

However, our Supreme Court has recently suggested, in the context of the so-called "marital presumption," that a father's status as presumed father is not irreproachable even after being established under KRS 406. See J.A.S. v. Bushelman, 342 S.W.3d 850 (Ky.2011). In that case, the Court repeated its holding in a previous case, that "[w]hen the advances of science serve to assist in the discovery of the truth, the law must accommodate them." Id. at 861 (citing Bartlett v. Commonwealth ex rel. Calloway, 705 S.W.2d 470, 472–73 (Ky.1986)). The Court in Bushelman, albeit again speaking in terms of the "marital presumption," went on to conclude "DNA testing now serves as an appropriate form of evidence, not to avoid the traditional presumption of paternity, but to rebut it." Id.

Accordingly, though it led to the undesirable result of leaving E.E.I. without a legal father, the trial court could not ignore the DNA test excluding Jack as the child's father. The record clearly reflects that Jack and Dana signed a voluntary acknowledgment of paternity two months after E.E.I.'s birth and registered it with the Registrar of Vital Statistics. Pursuant

to 406.021(4), this created a rebuttable presumption that he was E.E.I.'s father.

Regardless of whether the presumption of Jack's paternity was rebuttable, however, the court's order recognizing him as E.E.I.'s father was subject to amendment under CR 60.02 in light of circumstances named in that rule, including conclusive and vital evidence such as the paternity test results. We see nothing in the record which indicates that the results of the paternity test could not reasonably have been obtained by Vance or CHFS "by due diligence at an earlier date." Accordingly, due to the import which DNA evidence now has in cases like this one, we conclude that the trial court did not abuse its discretion in amending the order on the basis of that evidence.

### C. Evidence To Be Considered

Finally, while we ultimately find for CHFS and Vance regarding the effect of the paternity test in this case, we are compelled to express our concern regarding such matters in the future. Forming the basis of presumptions such as the "marital presumption" and "presumption of legitimacy" is a long-standing public policy strongly opposed to leaving a child fatherless—a policy often invoked by CHFS when it opposes an action by a legal father to disestablish paternity.[1] As a result, our courts are torn between such social policy and the increasing relevance and reliability of DNA testing. Inconsistent rulings have, at times, made it difficult for fathers to receive from our courts

the benefit of law and procedures such as those which CHFS presently employs.

That our courts have, in the past, permitted CHFS and other parties to benefit from this policy when it suits their objective and to ignore it when it does not, is perhaps the regrettable consequence of the evolving and confusing nature of this particular legal issue. Nevertheless, for our courts to continue to permit this would perpetuate an intolerable double-standard within the law which is inherently unfair to those who, despite conclusive evidence to the contrary, have been held legally and financially responsible for a child that is not theirs on the sole basis of social policy.

Therefore, in an attempt to resolve this inconsistency, let us be clear on this point. In cases such as this one, where a party employs CR 60.02 to disestablish paternity and seeks to do so with the results of an already-completed[2] DNA test, the results of that test shall be the predominant factor in the trial court's decision. Of course, the trial court retains the discretion which accompanies its consideration of a CR 60.02 motion, and other exceptions, such as the doctrine of paternity by estoppel, may still be considered. However, DNA evidence must overshadow considerations related to public policy. This, we believe, is the fair and correct result in light of *Bushelman.*

"Justice is the court's constant destination, relentlessly pursued. It is not arrived at where a court in a paternity action adjudicates a man to be the father of a child while knowing full well that the bio-

---

1. As an example of the application of this policy to a presumption of paternity, *see Bartlett v. Commonwealth ex rel. Calloway,* 705 S.W.2d 470 (Ky.1986) (Wintersheimer, J., dissenting). *See also Bradshaw v. Bradshaw,* 295 S.W.2d 571 (Ky.1956); *Simmons v. Simmons,* 479 S.W.2d 585 (Ky.1972); *Denzik v. Denzik,* 197 S.W.3d 108 (Ky.2006) (Lambert, C.J., dissenting).

2. It is not our intent to require Circuit and Family Courts to order, and the Commonwealth to pay for, DNA testing for every party who wishes to disestablish. Our ruling does not apply to such motions and courts retain the discretion to grant or deny such motions. We address only those cases in which a party moves the court based on paternity test results already in-hand.

logical relationship has been clearly disestablished." *Crowder v. Com. ex rel. Gregory,* 745 S.W.2d 149, 151 (Ky.App.1988). CHFS now finds itself in the rare position of advocating inviting us to adopt, rather than to deny, this principle. We accept the invitation to do so, in the interest of resolving the oft-repeated conflict in our courts which results when CHFS argues the opposite position in the name of public policy. The Supreme Court has provided our courts with reason to rely on authority more persuasive and more controlling than mere public policy. We employ that authority today in finding for CHFS; but for the sake of consistency, trial courts must do the same in the future, *regardless of who seeks disestablishment.*

### D. Paternity by Estoppel

 Jack finally argues that the trial court erred in granting the motion because the result of the paternity test "has no impact on Jack's legal standing as E.E.I.'s parent" via the legal doctrine of paternity by estoppel. As this would constitute an unprecedented and unjustified extension of this equitable doctrine, we disagree.

The concept of paternity by estoppel is relatively new to Kentucky jurisprudence, having been first acknowledged in *S.R.D. v. T.L.B.,* 174 S.W.3d 502, 506 (Ky.App. 2005). In that case, this Court noted the elements of such a claim: (1) Conduct, including acts, language and silence, amounting to a representation or concealment of material facts; (2) the estopped party is aware of these facts; (3) these facts are unknown to the other party; (4) the estopped party must act with the intention or expectation his conduct will be acted upon; and (5) the other party in fact relied on this conduct to his detriment. *Id.* at 506 (*citing J. Branham Erecting & Steel Serv. Co., Inc. v. Kentucky Unemployment Ins. Comm'n,* 880 S.W.2d 896, 898 (Ky.App.1994)).

In the brief history of this legal doctrine, it has been used by various parties, including the Commonwealth, to estop a legal father from disclaiming paternity. The doctrine does so on equitable grounds, affirming the idea that a person who supports a child financially, physically and emotionally when he knew he was not her biological father should not be permitted to cease that support when it suits him. Jack, however, asks us to extend this principle to his current situation—a father who is the legal father and wishes to remain so, despite efforts by the Commonwealth to exclude him from custodial consideration. In other words, instead of himself being estopped from disclaiming his paternity, Jack seeks, in essence, to estop CHFS from challenging his paternity.

 As support for this argument, Jack points to the fact that he wants to be E.E.I.'s father regardless of the paternity test, that he has always held himself out as her father, that he is the only father E.E.I. has ever known in her brief life and that he has worked with authorities in the neglect case to achieve reunification with E.E.I. and was doing so prior to the results of the paternity test. However, the doctrine of equitable estoppel is predicated on the theory that

> where one has, by a course of conduct, with a full knowledge of the facts with reference to a particular right or title, induced another, in reliance upon such course of conduct, to act to his detriment, he will not thereafter be permitted in equity to assume a position or assert a title inconsistent with such course of conduct, and if he does he will be estopped to thus take advantage of his own wrong.

*S.R.D., supra,* at 506 (*quoting Farmer v. Gipson,* 201 Ky. 477, 257 S.W. 1, 2 (1923)). *S.R.D.*'s extension of equitable estoppel to paternity cases does not address situations like the one to which Jack currently wishes

us to apply it. Jack provides no authority for extending the doctrine to cases where a man who is found not to be a child's father is entitled to estop other parties from excluding him as father; he only provides authority for the doctrine's limited application to situations distinguishable from his. Hence, we are unable to extend the doctrine now.

Furthermore, as we found earlier regarding the trial court's erroneous finding of fraud, we do not believe Jack possessed "full knowledge" of the fact that he was not E.E.I.'s father. This must then also mean that he could not have, "by a course of conduct, ... induced [CHFS, Vance or E.E.I.] ... to act to [their] detriment[.]" *S.R.D., supra,* at 506. Accordingly, we find that the doctrine of paternity by estoppel is of no assistance to Jack.

### Conclusion

Due to the similar claims and questions of fact or law, namely paternity and custody, between the divorce case and the neglect case, we find that the trial court properly permitted CHFS and Vance to intervene. Similarly, we find that, while the trial court's finding regarding fraud was insufficiently supported by the record, the trial court correctly amended the divorce order based on the results of the paternity test results. Therefore, we affirm the order of the Casey Circuit Court.

CAPERTON, Judge, concurs.

VANMETER, Judge, concurs in result only.