NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

2nd Circuit Court-Lebanon Family Division
No. 2018-0013

IN THE MATTER OF HALEY ST. PIERRE AND ADAM THATCHER

Argued: March 6, 2019
Opinion Issued: May 31, 2019

Family Legal, PC, of Concord (Jay Markell on the brief and orally), for the petitioner.

Decato Law Office, of Lebanon (R. Peter Decato on the brief and orally), for the respondent.

LYNN, C.J. The respondent, Adam Thatcher, appeals an order of the Circuit Court (Luneau, J.) granting the emergency motion of the petitioner, Haley St. Pierre, to relocate with her child to Florida. We affirm.

I

The following facts were found by the trial court, or are otherwise supported by the record and undisputed on appeal. The respondent and the petitioner met in August 2012. Later that year, they moved in together, having developed a romantic relationship. In February 2013, the petitioner traveled to New York for a weekend, where she had sexual relations with Colby Santaw, her former boyfriend. Shortly thereafter, she discovered that she was pregnant. Upon learning of the pregnancy, she informed the respondent that he was the father, and notified Santaw that he was not. The respondent, having been made aware of the petitioner's intimate relations with Santaw,

asked the petitioner if Santaw could be the father. The petitioner assured the respondent that the child was his.

The child was born on October 31, 2013. An affidavit of paternity was completed by the parties at the hospital following the child's birth. Prior to signing the affidavit, the parties were informed by hospital staff that if they thought there was a chance that the respondent was not the father, they should not sign the affidavit. Section II of the affidavit, labeled "Information About the Child's Natural Father," included the following declaration above the father's signature line:

> I am signing this Affidavit voluntarily and of my own free will. No force has been used upon me, and no threats or promises made to me by anyone. I understand that by signing this Affidavit I am declaring I am the natural father of the child named above . . . and accept financial and legal responsibility for the child and shall be subject to the child support provisions of RSA 168-A:2. I understand that a signed Affidavit is a finding of paternity equal to a finding by a court of law.

Following completion of the affidavit by the parties, the respondent was listed as the child's father on the birth certificate.

The parties married in January 2014, and, citing irreconcilable differences, divorced in July 2015. Following the divorce, the petitioner rekindled her relationship with Santaw. On a trip together in October 2015, the petitioner and Santaw began discussing the birthdate of the child. After considering the timing of his intimate relationship with the petitioner and the child's date of birth, Santaw believed that he might be the child's father. This belief was strengthened when he compared baby pictures of the child to his own baby pictures, and noticed a resemblance. Shortly thereafter, the petitioner and Santaw agreed to conduct genetic testing. In October 2015, these test results confirmed that Santaw was the child's biological father.

Following this discovery, the petitioner, as a self-represented litigant, filed a "Petition to Change Court Order" in the trial court, requesting that the court amend the parties' parenting plan, instituted after their divorce, by removing the respondent's name from the child's birth certificate, changing the child's last name, and granting the petitioner full custody. In support of this request, the petitioner stated that the respondent was not the child's biological father, that the biological father was filing for custody rights, and that the biological parents (the petitioner and Santaw) now lived together and wished "to keep the biological nuclear family intact." Santaw intervened, requesting that the court award him parental rights as the child's biological father, issue a parenting plan describing those parental rights, and change the child's last name to "Santaw."

The respondent filed an answer and counterclaim in December 2015, in which he asserted that he stood in loco parentis to the child because he had intentionally accepted the rights and duties of natural parenthood. He further claimed that, although he was not the child's biological father, he was her "psychological parent," as he had demonstrated "a full commitment to raising and caring for [her]." He stated that it was the court's duty to "protect the interests of the child in custody determinations," and asked that the court deny the relief requested by the petitioner and Santaw, and instead award him primary physical responsibility of the child.

On March 17, 2017, following a hearing in which the parties and Santaw testified, the trial court issued an order. The court explained that, pursuant to RSA 5-C:28, III, a party challenging an affidavit of paternity beyond 60 days from its filing must do so in "a court of competent jurisdiction." See RSA 5-C:28, III (2013). The court further stated that, under federal law, the challenge must be made "on the basis of fraud, duress, or material mistake of fact." See 42 U.S.C. § 666(a)(5)(D)(iii) (2012). The trial court concluded that Santaw, as a "putative father," had standing to challenge the affidavit of paternity, and that, "[b]ased on the weight of credible evidence," he had succeeded in proving either fraud or material mistake of fact. In so finding, the court explained that in completing the affidavit of paternity, the parties had either been ignorant of the fact that the respondent was not the biological father, and therefore made a material mistake of fact, or they had deliberately disregarded the fact, in which case they had committed a fraud. The court further found that Santaw was the child's biological father, and ordered that the paternity affidavit be rescinded and the birth certificate amended to reflect this fact. The court declined to issue a parenting plan between the petitioner and Santaw so long as they "are an intact couple," and also declined to change the child's last name, explaining that the issue "was not sufficiently addressed or developed at the hearing," and that, regardless, it was a decision that the petitioner and Santaw could make together.

The trial court also ruled that, because the respondent had been married to the petitioner, he would retain his status as a stepparent and therefore would "not lose his ability to ask for parenting rights and responsibilities" over the child. The court found that the respondent has "a very strong bond with the child" that "is in the nature of a parental bond." The court further found that the respondent had raised the child since birth, and concluded that it would be in the child's best interests for the respondent to have parenting time with her.

The court next turned to the petitioner's request, made in a motion filed prior to the hearing, to relocate the child to Florida where, at that time, Santaw resided and the petitioner was planning to move. The court determined that the petitioner had not met her burden by a preponderance of the evidence to show that the relocation of the child was for a legitimate purpose. See RSA

3

461-A:12, V (Supp. 2016). The court noted that while the petitioner was engaged to Santaw, the two were not yet married. The court further noted that the petitioner did not yet appear to have any job prospects in Florida and that if she stayed in New Hampshire, Santaw would be able to travel from Florida to be with her. In addition, the court concluded that the respondent had met his burden to show that relocation was not in the child's best interests, as his contact with the child would be greatly affected by the move because he would no longer be able to be a regular participant in the child's life. "Based on the weight of the credible evidence," the court determined that, "at th[at] time," relocation to Florida was "not a necessary move" for the child. The court vacated the parenting plan between the respondent and the petitioner and issued a parenting schedule to be followed by the respondent.

Almost four months later, on July 6, 2017, the petitioner filed an emergency motion to suspend the respondent's parenting time. Her motion was based on the following alleged facts: (1) on July 3, 2017, the child was with the respondent when she fell into a bonfire and suffered severe burns; (2) the respondent did not notify the petitioner of the injury until almost 13 hours later; (3) the respondent did not take the child to a hospital or otherwise treat her wounds; and (4) when the petitioner took the child to the hospital, she was treated for second degree burns. The petitioner notified the trial court that there were active investigations by the New Hampshire Division for Children, Youth and Families, the Vermont Department for Children and Families, and the Vermont State Police into the respondent's conduct. She asserted that, due to the "gross negligence" of the respondent, the trial court should award her sole parental responsibility over the child and allow the child to move to Florida.

On July 27, 2017, following a hearing, the trial court issued an adjudicatory order on the petitioner's emergency motion. The court found that the child, while under the respondent's supervision, had fallen into a campfire and sustained "serious burns on her arms, thumb and back as a result, which may require surgery." The court further found that the respondent had failed to notify the petitioner of the injuries until the following day, and that, while his friend had consulted with a doctor, who examined pictures of the child's injuries over the phone, the respondent had not taken the child to obtain medical assistance. In addition, the court found that when the petitioner took the child to the hospital the following afternoon, she was transported to a burn center in Boston, Massachusetts for specialized care, due to the level and location of her burns. The trial court concluded that the accident was "avoidable," and that there was reason to modify, on a temporary basis, the allocation of decision-making responsibilities, as well as the parenting schedule.

The trial court also reconsidered its decision on the child's relocation to Florida. The court found that the parties' circumstances had changed since

4

the initial hearing, and that, most notably, the petitioner and Santaw were now married. The court concluded that "[b]eing able to be with her husband" was a "legitimate reason" for the petitioner to relocate, and further concluded that it was reasonable for her to relocate to Florida, given that Santaw's business is located there, and he is unable to move the business because of its state-specific nature. The court next considered whether the respondent had shown that relocation was not in the child's best interests. Again, the court noted that circumstances had changed since its initial order. The court found that the respondent's delay in contacting the petitioner about the child's injuries exemplified the petitioner's assertions that the respondent does not communicate with her. The court stated that the parties' inability to communicate was a "legitimate issue," as the child "is very young, and depends on the adults to communicate adequately about her needs to keep her safe." The court explained that it had "some concerns" about the respondent's "ability to properly supervise" the child, as well as concerns about his decision-making abilities. The court found that "[n]o satisfactory explanation" had been made as to why the child had been allowed to be so close to the fire pit, and concluded that the respondent's delay in communicating with the petitioner and in seeking medical care was "not justified." The court further found that the incident was "concerning," and declared that it met the standard for modification of a parenting plan. See RSA 461-A:11, I(c) (Supp. 2016).

In light of these findings, the court concluded that it was in the best interests of the child to award primary residential responsibility to the petitioner and allow the petitioner and the child to relocate to Florida. The court delayed the relocation to provide the respondent with "a chance to normalize his relationship" with the child. In addition, the court ordered that, after the move, the respondent could see the child "for an extended three day weekend [in New Hampshire] around the Thanksgiving and Christmas holidays," and for "extended weekends" in New Hampshire during the months of April, June, and August. The court directed that, for the remainder of the year, the respondent travel to Florida to spend one long weekend with the child each month. The respondent thereafter filed this appeal.

II

The family division of the circuit court has equitable powers in cases, such as this one, that lie within its subject matter jurisdiction. See RSA 490-D:2 (Supp. 2018), :3 (2010); Fam. Div. R. 2.1. These equitable powers are "broad and flexible," allowing the family division "to shape and adjust the precise relief to the requirements of the particular situation." In the Matter of Neal & DiGiulio, 170 N.H. 671, 678 (2018) (quotation omitted); accord Dunlop v. Daigle, 122 N.H. 295, 300 (1982). A court exercising its equitable powers "will order to be done that which in fairness and good conscience ought to be or should have been done," and will "administer all relief which the nature of the case and facts demand." In the Matter of Neal, 170 N.H. at 678 (quotation

5

omitted).  We review the trial court's decision whether to grant equitable relief for an unsustainable exercise of discretion.  Id.  In so doing, "we determine whether the record establishes an objective basis sufficient to sustain the discretionary judgment made."  Id. (quotation omitted).  "The party asserting that a trial court order is unsustainable must demonstrate that the ruling was unreasonable or untenable to the prejudice of his case."  Id. (quotation omitted).

As an initial matter, the respondent asserts that Santaw lacked standing to challenge the affidavit of paternity.  He argues that RSA 5-C:28 permits challenges only by signatories to the affidavit, and not by third parties.  We need not address this claim, however, as we conclude that the petitioner, a signatory to the affidavit, challenged the affidavit when she filed her "Petition to Change Court Order."

RSA 5-C:28 provides that "[a] parent or legal guardian may request to rescind an affidavit of paternity from the clerk of the city or town where the birth occurred within 60 days of the filing of an affidavit."  RSA 5-C:28, I (2013).  "After the 60-day rescission period has passed, any challenge to the affidavit shall be decided only by a court of competent jurisdiction."  RSA 5-C:28, III.  Here, the petitioner filed her petition outside of the 60-day rescission period, and, thus, to comply with the statute, she was required to file it in a "court of competent jurisdiction."  See RSA 5-C:28, III; RSA 490-D:2; Fam. Div. R. 2.1; see also In the Matter of Neal, 170 N.H. at 675.  The petitioner met this requirement by filing her petition in the family division of the circuit court.  See RSA 490-D:2; Fam. Div. R. 2.1.

Still, the respondent argues that, because the petition was not filed as a motion to rescind an affidavit of paternity or to disestablish paternity, and instead requested that the court amend the parenting plan, it was insufficient to challenge the affidavit.  As we have previously pointed out, however, RSA 5-C:28 does not define what procedures apply to the challenge of an affidavit of paternity beyond the 60-day rescission period.  In the Matter of Neal, 170 N.H. at 675.  Although RSA 5-C:27 sets forth specific procedures for completing a rescission of paternity form where a signatory is seeking to rescind the affidavit within the 60-day rescission period, see RSA 5-C:27 (2013), the legislature has declined to set forth instructions on challenging an affidavit outside of the 60-day rescission period.  See In the Matter of Neal, 170 N.H. at 675.  Thus, because there are no procedural requirements set forth by RSA 5-C:28 as to how to proceed with a paternity challenge once the 60-day rescission period has run, the respondent cannot show that the petitioner was noncompliant with any statutory mandate.  See id.

We also find it noteworthy that the petitioner filed her "Petition to Change Court Order" as a self-represented litigant.  Under our case law, self-represented parties "are bound by the same procedural rules that govern

6

parties represented by counsel." In the Matter of Birmingham & Birmingham, 154 N.H. 51, 56 (2006). This mandate, however, does not prohibit courts from liberally construing pleadings by self-represented litigants, provided that the self-represented party pleads sufficient facts for the court to discern the correct cause of action. See Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997) (stating that, while being self-represented "does not insulate a party from complying with procedural and substantive law," complaints filed by self-represented parties must be liberally construed). Furthermore, "[i]n this jurisdiction, pleadings are construed liberally, . . . and, if counsel can understand the dispute and the court can decide the controversy on its merits, the pleadings are adequate." Robbins v. Seekamp, 122 N.H. 318, 322 (1982).

In her petition, the petitioner asked the trial court to remove the respondent from the child's birth certificate, change the child's last name, and grant her full custody of the child. She requested this relief based on the following facts: (1) that the respondent is not the child's biological father; (2) that the biological father is filing for his custody rights; and (3) that both biological parents live together and wish to keep the biological nuclear family intact. Given the relief sought, as well as the factual basis alleged for that relief, the petitioner provided the trial court with enough information to discern that the petitioner was effectively seeking to disestablish paternity in one person and establish it in another. Her intentions were apparent, given our decision in Bodwell v. Brooks, 141 N.H. 508 (1996), which states that the concept of dual paternity is not recognized in New Hampshire. See Bodwell, 141 N.H. at 511; accord In re Paternity of D.L., 938 N.E.2d 1221, 1225 (Ind. Ct. App. 2010) (stating that, following the execution of a voluntary acknowledgment of paternity, if paternity is established in another man, it follows that it must be disestablished in the first); Callahan v. Department of Revenue, 800 So. 2d 679, 683 (Fla. Dist. Ct. App. 2001) (stating that "only one person can be the biological father of a child"). Indeed, this is precisely what the trial court accomplished when it named Santaw as the biological father and placed the respondent in the position of a stepfather.

The respondent also contends that an affidavit of paternity is the equivalent of a final judgment that, according to our case law, cannot be challenged through genetic testing. In support of this argument, the respondent relies primarily on our decision in In the Matter of Gendron & Plaistek, 157 N.H. 314 (2008), in which we held that the trial court erred in ordering genetic testing in support of the mother's challenge to the paternity affidavit, as the testing was not in the best interests of the child. Matter of Gendron, 157 N.H. at 321.

In Matter of Gendron, the parties executed a "Voluntary Acknowledgment of Paternity" in Massachusetts following the birth of the child. Id. at 315. Almost three years later, the mother asserted, in a responsive court pleading, that the father was not the child's biological father, and requested that the

7

court order DNA testing to establish paternity.  Id. at 316.  The trial court ordered the father to submit to genetic testing, and he appealed.  Id. at 316-17.  Under Massachusetts law, a challenge to a voluntary acknowledgment of paternity, if made outside of the 60-day rescission period, must be brought within one year of the date of signing the acknowledgment.  Id. at 318 (citing Mass. Gen. Laws ch. 209C, § 11(a) (2007)).  Massachusetts law also dictates that, if the acknowledgment has not been challenged in accordance with the foregoing requirement, "'no judicial proceeding shall be required or permitted to ratify [the] acknowledgement,' and the acknowledgement 'shall be recognized as a sufficient basis for seeking an order of support, visitation or custody with respect to the child without further proceedings to establish paternity.'"  Id. (quoting Mass. Gen. Laws ch. 209C, § 11(a)).  Giving full faith and credit to Massachusetts laws regarding the establishment of paternity, we concluded that, because the mother had filed her challenge almost three years after the execution of the acknowledgment, the acknowledgement had not created a presumption of paternity, as argued by the mother, but rather had established paternity.  Id. at 317-19.  We stated that, because the acknowledgment established paternity, there was no need for additional proof of paternity.  Id. at 318-19.  In so doing, we explained that "[c]ertainty and finality are particularly important in paternity determinations because stability and continuity of support, both emotional and financial, are essential to a child's welfare."  Id. at 321 (quotation omitted).  Thus, we held that the trial court's directive for the father to submit to genetic testing was not in the child's best interests.  Id.

We disagree with the respondent's assertion that Matter of Gendron prohibits the petitioner from challenging the affidavit of paternity through evidence of genetic testing.  Unlike the Massachusetts statute, which places a one-year limitation on challenges brought outside of the 60-day rescission period, the New Hampshire statute does not put time constraints on challenges beyond the initial 60-day period.  See RSA 5-C:28, III.  Moreover, while a paternity affidavit executed in New Hampshire, much like in Massachusetts, has "the legal effect of establishing paternity without requiring further action," the New Hampshire legislature has carved out an exception to this rule where the affidavit is "rescinded pursuant to RSA 5-C:28."  RSA 168-A:2 (2014).  Thus, unlike in Massachusetts, a presumption of paternity executed in New Hampshire does not become irrebuttable if unchallenged within a prescribed time period.[1]  Cf. Bodwell, 141 N.H. at 511 (stating that presumption of paternity based on a marital relationship is rebuttable and that it may be challenged with blood tests).

The respondent also cites Matter of Gendron in support of his policy argument that disestablishment of his paternity is contrary to the best interests of the child because "[p]ublic policy demands that children have the

---

[1] We note that paternity petitions brought under RSA chapter 168-A, must be brought "within 18 years of the date of the birth of the child in question."  RSA 168-A:12 (2014).

right to certainty in their relationships with their parents." Matter of Gendron, 157 N.H. at 321 (quotation omitted). As the Court of Appeals of Kentucky has noted, however, there are some circumstances, such as those presented here, where "DNA evidence must overshadow considerations related to public policy." Ipock v. Ipock, 403 S.W.3d 580, 587 (Ky. Ct. App. 2013) (quotation omitted). Unlike our other cases cited by the respondent, see Watts v. Watts, 115 N.H. 186 (1975); McRae v. McRae, 115 N.H. 353 (1975), this case is not one where a presumed father seeks, years later, to disprove his own paternity so as to avoid paying child support. See Watts, 115 N.H. at 188-89 (stating that the presumption of paternity could not be rebutted by blood tests because the "defendant ha[d] acknowledged the children as his own without challenge for over 15 years"); McRae, 115 N.H. at 355 (stating that "[t]o permit the husband to raise the question of paternity after an eight-year period of uninterrupted acquiescence . . . would contravene the policy of this State's law to protect the child and the spouse from the belated resort to scientific proof in an effort to escape parental responsibility"). Indeed, the facts of this case are unique. Here, there are two men who desire to be the child's legal father, and are willing to take on all of the responsibilities associated with that title. In a case such as this one, "justice is not arrived at where a court . . . adjudicates a man to be the father of a child while knowing full well that the biological relationship has been clearly disestablished." Ipock, 403 S.W.3d at 587-88 (quotation omitted).

Our recognition of the importance of honoring an admitted DNA test in the circumstances of this case does not undo our holdings in Watts and McRae, as a party may continue to rely on the doctrine of paternity by estoppel to prevent a legal father from disclaiming paternity. See Hansen v. Hansen, 119 N.H. 473, 475 (1979) (stating that paternity may be established through "the establishment of an estoppel by one charged with the paternity because of his failure to question it after a substantial period of uninterrupted acquiescence" (quotation omitted)); Ipock, 403 S.W.3d at 588 (noting that the doctrine of paternity by estoppel affirms "the idea that a person who supports a child financially, physically and emotionally when he knew he was not [the] biological father should not be permitted to cease that support when it suits him"); see also Emily J. Stolzenberg, The New Family Freedom, 59 B.C. L. Rev. 1983, 2016 (2018) (explaining that "estoppel functions to prevent an adult from disclaiming a parental role he or she had previously been fulfilling"). In addition, while the doctrine does not apply to the circumstances of this case, we can conceive of situations where application of the doctrine to a challenge presented by a biological father may be appropriate.

Next, the respondent argues that the trial court erred in rescinding the paternity affidavit because, in challenging the affidavit, the petitioner failed to prove fraud or material mistake of fact. As an initial matter, we note that the current version of RSA 5-C:28 does not require a party, challenging an affidavit of paternity outside of the 60-day rescission period, to demonstrate such proof.

RSA 5-C:28, III. But see RSA 5-C:11, VII (2003) (repealed and reenacted in 2005). However, the parties do not dispute the applicability of Title 42, Chapter 7, Subchapter IV, Part D of the Social Security Act (Title IV-D), which sets forth such a requirement, to the case before us. See 42 U.S.C. § 666(a)(5)(D)(iii) (requiring states that receive federal welfare funding under Title IV-D to establish procedures under which, after the 60-day rescission period, "a signed voluntary acknowledgement of paternity may be challenged in court only on the basis of fraud, duress, or material mistake of fact, with the burden of proof upon the challenger" (emphasis added)). Thus, for the purposes of today's decision, we assume, without deciding, that the requirements of Title IV-D apply.

In light of this federal requirement, we conclude that the court was correct in ruling that the petitioner met the burden of proving material mistake of fact in challenging the affidavit of paternity. As we have stated in the past, a trial court's finding that a party signed an affidavit of paternity with the mistaken belief that he was the father is the equivalent of the court finding a "material mistake of fact." In the Matter of Neal, 170 N.H. at 677, 679 (analyzing language in a voluntary acknowledgment of paternity executed in Maine); see also Bay County Prosecutor v. Nugent, 740 N.W.2d 678, 682 (Mich. Ct. App. 2007) (stating that where plaintiff established both that defendant signed the affidavit of paternity believing he was the biological father and that a DNA test later determined that someone else was the biological father, "[p]resentation of the unchallenged DNA evidence was sufficient to establish a mistake of fact"). The record supports the trial court's finding that the parties "were mistaken concerning the baby's paternity." Although the respondent admitted in the trial court that he had "doubts" about being the child's biological father, he also testified that, at the time he signed the paternity affidavit, he believed that he was the child's biological father. Furthermore, the petitioner testified that she informed the respondent that he was the biological father, and that she, too, believed that to be the truth at the time the affidavit was executed. Thus, the record supports the trial court's conclusion that, in signing the affidavit, the respondent was "relying on incorrect information [the petitioner] gave him about the child's paternity." See Bay County Prosecutor, 740 N.W.2d at 682 (stating that "[r]egardless of whether defendant intended to be the father when he signed the affidavit . . . , and whether he intended to remain the legal father after he learned that he was not the child's biological father, the evidence established that defendant's decision to acknowledge paternity . . . was based, at least in part, on a mistaken belief that he was, in fact, the biological father"). Because we conclude that the evidence presented in the trial court is sufficient to uphold the trial court's finding of a material mistake of fact, we decline to address the trial court's alternative finding of fraud.

The respondent next argues that the trial court erred when it allowed the child's relocation in its ruling on the petitioner's emergency motion. As stated

above, however, the trial court, in reviewing the parties' arguments, was exercising its "broad and flexible equitable powers . . . to shape and adjust the precise relief to the requirements of the particular situation." In the Matter of Neal, 170 N.H. at 678. Given the broad discretion afforded the trial court, we will affirm the court's determination so long as the record demonstrates an objective basis sufficient to sustain the court's judgment. In the Matter of Heinrich & Curotto, 160 N.H. 650, 655 (2010). We conclude that the record does so here.

In reconsidering the petitioner's relocation request, the trial court correctly applied RSA 461-A:12, V, which requires the party seeking to relocate to prove, by a preponderance of the evidence, that: (1) "[t]he relocation is for a legitimate purpose"; and (2) "[t]he proposed location is reasonable in light of that purpose." RSA 461-A:12, V. As found by the trial court, and supported by the record, after the court first denied the petitioner's relocation request, circumstances had changed — the petitioner had married Santaw and desired to reside in Florida with her now husband. In addition, Santaw's state-specific business is located in Florida, making it difficult for him to move. Therefore, the record supports the court's conclusion that the petitioner's request to be with her husband was for a legitimate purpose, and that Florida was a reasonable location in light of that purpose.

The trial court, as required by the statute, next looked to whether the respondent had proven, "by a preponderance of the evidence, that the proposed relocation [wa]s not in the best interests of the child." RSA 461-A:12, VI (Supp. 2016). Again noting that circumstances had changed since its initial decision on relocation, the trial court focused on the inability of the respondent to communicate effectively with the petitioner. The court found that this lack of communication was shown by the respondent's delay in contacting the petitioner after the child sustained serious burns that required medical attention while in his care. The court stated that, given the child's "very young" age and her dependency on the adults in her life "to communicate adequately about her needs to keep her safe," the parties' inability to communicate is a "legitimate issue." Furthermore, after the occurrence of the child's injuries, the court had concerns about the respondent's "ability to properly supervise" the child. Given these findings, the court's conclusion that the petitioner and the child should relocate to Florida was supported by the record.

Similarly, we also conclude that the trial court did not commit an error when it failed to consider, in its initial order, the respondent's counterclaim requesting primary physical responsibility over the child. In rescinding the affidavit of paternity, awarding Santaw the status of legal and biological father of the child, and referring to the respondent as a stepparent, the trial court impliedly considered the respondent's request. The respondent argues, however, that the court should have analyzed his request by applying the best-

interests-of-the-child factors set forth in RSA 461-A:6.  See RSA 461-A:6 (2018) (amended Supp. 2018).  Although the statute requires that the court "consider" the best interests of the child, see RSA 461-A:6, I, the court is required to set forth the reasons for its decision in a written order only if requested to do so by an aggrieved party, see RSA 461:A:6, VII.  Here, there is nothing in the record to indicate that the respondent made such a request.  Regardless, it is clear from the court's order that it did consider the best interests of the child in making its determination.  Indeed, the trial court stated that the respondent "has a very strong bond with the child which is in the nature of a parental bond," and concluded that "[i]t would be in [the child]'s best interests for [the respondent] to have parenting time."

In sum, we believe that the record supports the trial court's rescission of the paternity affidavit based on its determination that there was a material mistake of fact made by the parties in executing the paternity affidavit.  We further believe that there is sufficient basis in the record to support the trial court's order granting primary custodial responsibilities to the petitioner and allowing the relocation of the child to Florida.  Accordingly, we affirm the trial court's order.

<u>Affirmed</u>.

HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

12