ANTOON, Judge.
G.F.C. appeals the trial court’s order dismissing his petition to establish paternity. G.F.C. contends that pursuant to section 742.011, Florida Statutes (1995), he has the right to challenge the paternity of a child born during an existing marriage. We disagree and affirm.
At the time of conception, the mother and her husband were living together and they have continued to live together since the birth of the child. At the time of birth, the husband’s name was placed on the birth certificate as the child’s father and he has at all times acknowledged the child to be his own. To this end, the husband also filed an affidavit acknowledging paternity.
G.F.C. petitioned the trial court to adjudicate him the biological and legal father of the child. The petition alleged that G.F.C. was the biological father of the child but contained no allegations that the mother’s husband was deficient in carrying out the responsibilities of a father or that G.F.C. had an established relationship with the child.
After G.F.C. filed suit for paternity, the mother and her husband moved to dismiss the petition on the basis that G.F.C. had no cause of action because the child was born to a marriage, and, as a result, was presumed to be legitimate. Before ruling on the motion to dismiss, the trial court appointed a guardian ad litem for the child and ordered that blood tests be performed to determine whether G.F.C. was the child’s biological father. The HLA test results indicated that G.F.C. was in fact the child’s biological father. A subsequent hearing was held on the motion to dismiss at which time the trial court heard from the guardian ad litem who reported that he favored leaving the family (husband, mother and child) intact. The mother and her husband again urged the court to dismiss the action, arguing that G.F.C. had no right to maintain the action because the husband was the child’s legal father and G.F.C.’s biological connection to the child was irrelevant. The trial court dismissed the action without allowing G.F.C. to present evidence as to whether he would be a better functional father than the husband.
*1384 According to G.F.C., dismissal of this petition was improper because he has the legal right to seek an adjudication of paternity and legal fatherhood over the objection of the child’s mother and her husband pursuant to section 742.011. G.F.C. argues further that the trial court erred in not conducting an evidentiary hearing to determine whether it would be in the child’s best interest to shift legal fatherhood to him. We disagree. G.F.C. had no right to institute this paternity action either under the common law, the Florida statutes, or the state and federal constitutions.
■Florida’s common law viewed any action challenging a child’s legitimacy with great disfavor. In fact, at common law only a husband had the right to challenge paternity of a child born during the marriage. However, there was little likelihood for his success. See Gossett v. Ullendorff, 114 Fla. 159, 154 So. 177 (1934). There existed an almost irrebuttable presumption that the husband was the father of his wife’s children, a presumption which could be overcome only upon a showing that the husband either was impotent or lacked access to his wife at the time of conception. See 41 Am.Jur.2d Presumption From Birth In Wedlock, § 10 (1995). So focused was the law on preserving the legitimacy of children and the sanctity of the family that it declared the husband and the wife to be incompetent to testify regarding the husband’s access. Michael H. v. Gerald D., 491 U.S. 110, 124, 109 S.Ct. 2338, 2342-43, 105 L.Ed.2d 91 (1989)(citing R. Graveson & F. Crane, A Century of Family Law, 1857-1957), reh’g denied, 492 U.S. 937, 110 S.Ct. 22,106 L.Ed.2d 634 (1989).
Our supreme court recently reaffirmed the common law presumption of legitimacy in Department of Health & Rehabilitative Services v. Privette, 617 So.2d 305 (Fla.1993). In Privette, HRS sued Privette for support of a child bom to a woman married to another man. The birth certificate named the husband as the child’s father. When Privette was ordered to submit to a human leukocyte test, he petitioned the district court for a common law writ of certiorari. The district court granted the petition, reasoning that Privette’s privacy rights and the best interests of the child should have been weighed by the trial court before ordering a human leukocyte test. Privette v. State Department of Health and Rehabilitative Services, 585 So.2d 364, 366 (Fla. 2d DCA 1991). Upon review, the supreme court expressed great concern about impugning the legitimacy of the child and the parental rights of the child’s legal father. The court defined a “legal father” as the man to whom the mother was married when the child was born and whose name appears on the birth certificate. 617 So.2d at 307. The court held that, “before a blood test can be ordered in this type of case, the trial court is required to hear argument of the parties, including the legal father, if he chooses to appear, and a guardian ad litem appointed to represent the child.” Id. at 308.
Nothing in Privette suggests that the supreme court was concerned with the rights of a man purporting to be the biological father. On the contrary, throughout its opinion, the court expressed a strong commitment to protecting the legitimacy of children and the interests of legal fathers. Justice Kogan wrote:
Once children are bom legitimate, they have a right to maintain that status both factually and legally if doing so is in their own best interest. Art. I, § 9, Fla. Const. The child’s legally recognized father likewise has an unmistakable interest in maintaining the relationship with his child un-impugned, (citations omitted) such that his opposition to the blood test and reasons for so objecting would be relevant evidence in determining the child’s best interests. (Footnote omitted.)

Id.

Interestingly, under the common law, a man in G.F.C.’s position would not have considered bringing an action to establish his paternity of a married woman’s child because to do so would have been an admission of adultery, a crime in many jurisdictions. 2 C.J.S. Adultery § 1 — 2 (1972). Society was *1385 so scornful of bringing children into the world as a result of adulterous conduct that “bastardy” was also a crime. See Commonwealth v. MacKenzie, 368 Mass. 613, 334 N.E.2d 613 (1975). Understandably, “fathers were less than eager to seek, by court order, a relationship with their illegitimate children.” C.C. v. A.B., 406 Mass. 679, 550 N.E.2d 365, 370, n. 7 (1990).
Unwed mothers were eventually granted the statutory right to institute suit to establish paternity and to seek child support. See 1920 Rev.Gen. St. § 3957. The right to sue for paternity was later expanded, on equal protection grounds, to married mothers. See Gammon v. Cobb, 335 So.2d 261 (Fla.1976) (portion of the statute which limited persons who could bring paternity actions to unmarried mothers of illegitimate children violated equal protection guarantees of the state and federal constitutions). See also § 742.011, Fla.Stat. (1983). More recently, our legislature provided that, under certain circumstances, men also have the right to sue for paternity. See § 742.011, Fla.Stat. (Supp.1986). However, this statute does not expand this right to a man such as G.F.C. who declares himself to be the father of a child born to an intact marriage.
In this regard, section 742.011 narrowly defines those who can sue to establish paternity, stating “any man who has reason to believe that he is the father of a child ... may bring proceedings ... to establish paternity of a child.” G.F.C. argues that by enacting this statute the legislature created a statutory cause of action for a putative father seeking an adjudication of paternity of a child born to the mother during her marriage to another man. However, in so arguing, G.F.C. fails to recognize that this statutory provision must be read in conjunction with the remainder of Chapter 742, including section 742.10, which states that “[t]his chapter provides the primary jurisdiction and procedures for the determination of paternity for children bom out of wedlock.” (Emphasis added).
Furthermore, as noted above, section 742.011 provides that a paternity action may be brought so long as paternity has not already been established “by law or otherwise.” Paternity would be established “by law” when there has been an adjudication of paternity or by the filing of affidavits or stipulation acknowledging paternity as provided in section 742.10. Paternity would “otherwise” be established when a child is born to an intact marriage and recognized by the husband and the mother as being their child. In such a case, the husband would be the child’s “legal father” to the exclusion of all others. Under any other interpretation, a husband could never be more than a presumptive father absent an adjudication of paternity. Had the legislature intended such a drastic departure from the common law, it would have specifically provided that a man believing himself to be the father of a child born during the mother’s marriage to another man has the right to sue to establish his paternity. Thus, the trial court properly dismissed G.F.C.’s petition because Chapter 742 does not afford G.F.C. the statutory right to sue for paternity since the child in question here was not born “out of wedlock” and the paternity of the child had been “otherwise” established. See Kennelly v. Davis, 221 So.2d 415 (Fla.), cert. denied, 396 U.S. 916, 90 S.Ct. 237, 24 L.Ed.2d 193 (1969). See generally, Purvis v. State, 377 So.2d 674 (Fla.1979); Knauer v. Barnett, 360 So.2d 399 (Fla.1978).
We also reject G.F.C.’s claim of a constitutional right to assert paternity. A similar claim was rejected by the United States Supreme Court in Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). In Michael H., the mother, while married to Gerald D., conceived a child by Michael H. Gerald was listed on the birth certificate as the father and he held the child out to be his own. After the child’s birth, the mother lived with Michael for a time during which he held the child out as his own and developed a father/daughter relationship with the child. However, when the mother later reconciled with Gerald, Michael challenged the enforcement of a California statute which created a rebuttable presump *1386 tion that a child born to a married woman living with her husband was the husband’s child and that only the husband or the wife could rebut the presumption. Specifically, he argued that he had a constitutionally protected liberty interest in his established father/daughter relationship and that the state’s termination of that relationship without affording him the opportunity to establish his paternity in an evidentiary hearing violated his substantive due process rights. The Supreme Court rejected this claim, explaining that “biological fatherhood plus an established parental relationship” does not establish a constitutionally protected liberty interest. In the court’s view, more was required. 491 U.S. at 122, 109 S.Ct. at 2341-42. Applying this reasoning to the instant facts, G.F.C.’s only relationship with the child is “biological fatherhood,” and thus, no constitutionally protected right exists.
We note parenthetically that a man claiming to be the biological father of a child born to an intact marriage may have a right, notwithstanding Michael H., to pursue an adjudication of paternity under the due process clause of our state constitution. However, if such a right exists, it is limited. In our view, such paternity claims should be recognized only in those circumstances where there is a claim of a developed relationship between the putative father and the child. See Traci Dallas, Rebutting the Marital Presumption; a Developed Relationship Test, 88 Colum.L.Rev. 369, 373 (1988). In this regard, in order for a man to institute an action for paternity of a child born during a marriage, the man would be required to at least allege that a developed relationship exists between himself and the child; an allegation of a mere biological link to the child would not suffice. Otherwise, in an extreme example, a man could be permitted to assert a cause of action for paternity of a child conceived as a result of a sexual battery. Consistent with this reasoning, we hold that, under the facts of the instant case, G.F.C. has failed to allege sufficient facts to assert a constitutionally based cause of action for paternity because he has not alleged that he has an established relationship with the child.
We note that, even if G.F.C. had alleged sufficient facts to assert a constitutionally based cause of action in paternity, he would not, as he contends, be entitled to receive a best interest hearing. To support his position, G.F.C. cites to Privette wherein our supreme court discussed the status of legal fatherhood. We do not read the holding in Privette as entitling G.F.C. to receive a best interest hearing to determine whether the status of legal father should be shifted to him. The purpose of the best interest predicate for the blood test described in Privette is the protection of the child’s legitimacy and the legal father’s interest in his relationship with the child. The best interest inquiry is not for the benefit of the man in G.F.C.’s position seeking to advance his claim of paternity to a child bom in wedlock.
In the instant ease, a best interest hearing would require the trial court to designate either the husband or G.F.C. as the child’s “legal father.” Only one could be chosen because there is no such thing as dual father-ship. If the trial court determined that it was in the child’s best interest that G.F.C. be designated the “legal father” the result would be the termination of the husband’s parental rights without there ever having been an allegation that the husband failed in any way to fulfill his responsibilities as a father. Certainly, more is required. The supreme court, weighing the rights of the legal father against those of the putative biological father, made this clear:
[Wjhile the presumption of legitimacy is rebuttable, it will not fail unless common sense and reason are outraged by applying it to the case at hand, [citations omitted]. We take this to mean that there must be a clear and compelling reason based primarily on the child’s best interest to overcome the presumption of legitimacy even after the legal father is proven not to be biological father. This is at least the equivalent of the burden of proof required that would exist in proceedings to terminate the legal father’s parental rights.
... There must be a clear and compelling reason based primarily on the child’s best *1387 interests to overcome the presumption of legitimacy even after the legal father is proven not to be the biological father. This is at least the equivalent of the burden of proof that would exist in proceeding to terminate the legal father’s parental right. (Citation omitted). (Italics in original.)
Privette, 617 So.2d at 309.
The significant burden of proof created by the Privette court is set forth in section 39.464, Florida Statutes (1995), Florida’s termination of parental rights statute. Section 39.464 requires clear and convincing proof that a parent has abused, abandoned, or neglected a child before a parent’s rights may be involuntarily terminated. Here, G.F.C.’s petition is void of any allegation remotely approaching those required to terminate a parent’s rights. Moreover, the petition fails to assert any compelling reason based on the best interest of the child to disturb the presumption of legitimacy. It is irrelevant that the trial court ordered the blood test before determining whether such tests would be in the best interest of the child because G.F.C.’s petition failed to state a cause of action to terminate the legal father’s status. Under Florida statutes and Privette, more than a mere allegation of biological fatherhood is necessary to terminate one’s status as “legal father.” It follows that a scientific determination that a man other than legal father is the child’s biological father is irrelevant.
In closing, we recognize that Florida’s courts will continue to be confronted with many similar delicate issues relating to children. Eventually, the legislature may further clarify the state’s policy with regard to the rights of children and fathers. Until then, we are reluctant to legally recognize lawsuits instituted by those simply professing to be biological fathers which impugn the legitimacy of children and disrupt families’ lives.
AFFIRM.
PETERSON, C.J., and DAUKSCH, J., concur.