PER CURIAM.
R.H.B. appeals a nonfinal order entered in an action to establish paternity that *347 requires him to pay temporary child support for a child born during the marriage of J.B.W., the mother and petitioner, and P.W., her husband. J.B.W. and P.W. remain married, living as a family with both this child and another child of their marriage. We reverse the order granting temporary relief because it was entered without due process. Although this case presents many additional questions concerning the role of a trial court in cases involving quasi-marital children who are conceived and born during an intact marriage, the record and the procedural posture of this case prevent this court from addressing those issues.
J.B.W. first commenced this case in 1998, when she apparently filed an action against R.H.B. entitled an action for support unconnected with a dissolution proceeding. This action did not seek support for herself, but rather sought R.H.B.’s support for a minor child. Because the record in this nonfinal appeal is an appendix of pleadings and documents filed in the trial court beginning in late 1999, this court does not have extensive information about what occurred in the early stages of this litigation.
In June 2000, J.B.W. filed an amended petition for determination of paternity pursuant to chapter 742, Florida Statutes (2000). The petition is unusual because it alleges that the child, who was about six years old at the time of the amended petition, was born during J.B.W.’s marriage to P.W. This child was apparently both conceived and delivered during this marriage. Moreover, although J.B.W. and P.W. considered a dissolution of their marriage after the birth of this child, they remain married and presently maintain a traditional family relationship. They have another older child together.
Thus, the factual allegations of this case establish that P.W. is the legal father of this child. See Dep’t of Health & Rehabilitative Servs. v. Privette, 617 So.2d 305 (Fla.1993). Moreover, because the couple has remained married, P.W. stands in loco parentis to the child and owes a duty of support to the child. See Albert v. Albert, 415 So.2d 818 (Fla. 2d DCA 1982); Taylor v. Taylor, 279 So.2d 364 (Fla. 4th DCA 1973). It is not clear from our record whether P.W. could now end his obligation of support in a divorce proceeding or whether he would be estopped to take that step. Compare C.C.A. v. J.M.A., 744 So.2d 515 (Fla. 2d DCA 1999) (holding legal father of child born during marriage was equitably estopped from denying child’s parentage after holding child out as his own for over two years), review granted, 762 So.2d 916 (Fla.2000), and review dismissed as improvidently granted by J.M.A. v. C.C.A., 803 So.2d 705 (Fla.2001), with Daniel v. Daniel, 695 So.2d 1253 (Fla.1997) (holding that husband who is not natural or adoptive parent of child and has not contracted to support child has no duty to pay child support upon dissolution of marriage).
R.H.B. moved to dismiss the amended petition, arguing that a woman should not be allowed to file a paternity action when the child’s legal father is still an active member of the family. Cf. S.B. v. D.H., 736 So.2d 766 (Fla. 2d DCA 1999) (holding that putative biological father could not maintain action for paternity of child in intact marriage where both legal father and mother objected), and G.F.C. v. S.G., 686 So.2d 1382 (Fla. 5th DCA 1997) (holding that putative biological father could not pursue paternity action for child of an intact marriage because section 742.011, Florida Statutes (2000), applied only to children “born out of wedlock” when paternity had not been established “by law or otherwise”). In the alternative, R.H.B. argued that the procedures established in *348 Privette applied in this case, and that a guardian ad litem and P.W., as legal father, should be added to the action prior to any determination.
On September 6, 2000, the trial court denied the motion to dismiss, finding that chapter 742 permitted J.B.W. to pursue the action for paternity. The trial court refused to grant J.B.W.’s request to make a summary determination of paternity but determined that temporary child support should be ordered against R.H.B. as the putative biological father. See § 742.031(1), Fla. Stat. (2000) (permitting court to issue temporary order of child support pending determination of parentage).[1] The trial court ordered counsel to confer and to attempt to stipulate to the monthly amount of child support that would be appropriate under the directives of section 61.30, Florida Statutes (2000).
R.H.B. filed a motion seeking rehearing of this order and scheduled a hearing on his motion. At the second hearing, R.H.B. again argued that J.B.W. could not pursue an action for paternity during her marriage to P.W. After the trial court indicated orally that if was going to deny the motion for rehearing, counsel for J.B.W. asked the trial court to establish an amount of temporary support based upon pleadings she had filed in the case. R.H.B. objected, noting that the issue of child support had not been noticed for hearing. The trial court overruled R.H.B.’s objection and calculated child support based upon J.B.W.’s pleadings. The trial court entered a second written order on October 10, 2000, denying rehearing and establishing temporary child support of $727 per month, but ruling that P.W. should be added to the litigation as an indispensable party. P.W.’s counsel was given ten days to file pleadings, but no further pleadings are contained in this record. An income deduction order for the monthly child support was also entered.
R.H.B. filed a notice of appeal in early November 2000. This court ruled that the appeal was untimely as to the order entered on September 6, 2000, because the motion for rehearing did not stay rendition.[2] See Deal v. Deal, 783 So.2d 319, 320-21 (Fla. 5th DCA 2001). This court ruled that the appeal could proceed only as to the second order, which is appealable only concerning the immediate monetary relief granted to J.B.W. See Fla. R.App. P. 9.130(a)(3)(C)(iii).
Before addressing the limited issue on appeal in this case, we express our concern about the ramifications of this type of action, where a married woman, apparently with the support of her husband, files an action seeking to establish paternity against a third party for a child born during their marriage. In an earlier time, such an action was prohibited. See Sanders v. Yancey, 122 So.2d 202 (Fla. 2d DCA 1960); § 742.011, Fla. Stat. (1975). However, in Gammon v. Cobb, 335 So.2d 261 (Fla.1976), the supreme court held that section 742.011 violated a child’s equal protection rights when it granted an unmarried woman the right to file a paternity action but denied an equal right to a mar *349 ried woman. To further support this holding, the supreme court acknowledged common law precedent that a husband may attack the paternity of a child born during his marriage, so long as he is able to overcome the strong presumption of legitimacy. Gammon, 335 So.2d at 263-64 (citing Eldridge v. Eldridge, 153 Fla. 873, 16 So.2d 163 (1944)).[3]
The facts that the supreme court considered in the Gammon case were quite compelling. The woman seeking support had resided with the putative father for twenty years, beginning during the era of common law marriage. The couple had seven children. Unfortunately, each member of this relationship had neglected to get divorced from earlier spouses. Thus, the woman filing the paternity action in Gammon was technically married to another man, but had not cohabited with him for a generation.[4]
In ruling that the woman in Gammon could file a paternity action, the court treated her children as “illegitimate.” The court stated:
Therefore, to require that the mother of an illegitimate child be legally unmarried at the time of the child’s conception in order to bring suit under the provisions of § 742.011, Florida Statutes, is an unreasonable and invidious discrimination against such child, depriving the child of equal protection of the law mandated by Article I, § 2 of the Constitution of the State of Florida and the Fourteenth Amendment to the Constitution of the United States.
335 So.2d at 267.
Although the children in Gammon may have seemed “illegitimate” from a practical perspective, from the legal perspective they were the legitimate children of the woman’s lawful husband. Thus, because of the difficult facts involved in the case, Gammon actually held the paternity statute unconstitutional in order to give legitimate children an option to seek support from a biological father who was not their legal father. In response to Gammon, section 742.011 was amended to delete the word “unmarried” and to permit “any woman” to file such an action. Ch. 83-214, § 13, at 849, Laws of Fla.
Seventeen years after Gammon, the supreme court issued its decision in Privette. In Privette, the mother filed a paternity action similar to the action filed in Gammon. Although the mother in Pri-vette had initially alleged that she was unmarried, by the time the case reached the supreme court it was apparent that she was married to another man, but that the couple had separated before the child was conceived. Without reference to Gammon, the supreme court ruled that: “Once children are born legitimate, they have a right to maintain that status both factually and legally if doing so is in their best *350 interests. Art. I, § 9, Fla. Const.” 617 So.2d at 307. To protect this right, the court created a complex process designed to protect the best interests of the child. Thus, reconciling Gammon and Privette, the supreme court has apparently held that the child of a married woman has an equal protection right arising in paternity that permits the mother to proceed against a man other than her husband, but this right is significantly restricted by the child’s countervailing due process right to legitimacy.
Both Gammon and Privette involved children conceived and born after the marital relationship with the legal father had collapsed. We have a particular concern about the ramifications of permitting such an action in this case, however, when the marriage is intact. Whether such actions will promote or harm marital stability is probably debatable. Unless the legal father is divested of rights in such an action, two men would apparently share a support obligation. For example, if P.W. still has a support obligation arising in loco parentis, how would one calculate a support obligation for the biological father? At least one court has indicated that such a result is untenable, and that there is no such thing as “dual fathership.” See Achumba v. Neustein, 793 So.2d 1013 (Fla. 5th DCA 2001); G.F.C. v. S.G., 686 So.2d 1382 (Fla. 5th DCA 1997).[5]
If there is one common thread in this panoply of cases involving quasi-marital children, it is the emphasis on the child’s best interest and particularly the child’s interest in legitimacy and stability. This factor would seem to be quite compelling in cases where the child resides in an intact family with his or her legal mother and father. As such, we approve of the trial court’s decision to follow the procedure established in Privette by appointing a guardian ad litem for the child and joining the legal father as a party to the action. See Privette, 617 So.2d at 308-09.
At this stage, we cannot resolve these issues. We highlight them to emphasize that they are difficult issues obviously presented by the facts in this case, which will continue beyond the issuance of this opinion. The limited issue on appeal, however, is simply whether the trial court erred by entering an order fixing the amount of temporary child support without proper notice to the putative biological father.
We have reviewed the transcript of the hearing held on October 6, 2000, leading to the entry of the temporary child support order and related income deduction order on October 10, 2000. That hearing was scheduled as a status conference and a hearing on R.H.B.’s motion for rehearing. The transcript reflects that only attorneys were present for this hearing; none of the parties appeared personally. At the end of the hearing, J.B.W.’s counsel requested that the trial court set the monthly amount of child support based upon documents she had filed in the court file. These documents included the mother’s financial affidavit, a child support guidelines worksheet prepared by her counsel, a document purported to be R.H.B.’s 1998 tax return, and some documents purporting to establish R.H.B.’s pay scale through his employment. R.H.B.’s counsel objected that the issue of the monthly amount of temporary child support was not set for hearing and could not be based solely upon the documents filed by J.B.W. In spite of this, and without taking any evidence, the trial court *351 entered an order based upon J.B.W.’s assertions setting child support at $727 per month. J.B.W. contends that the court had authority to proceed with disposition on the merits of her petition, at least temporarily, pursuant to section 742.031(1). However, the statute does not obviate the necessity for proper notice.
Regarding due process, the supreme court recently stated:
The basic due process guarantee of the Florida Constitution provides that “[n]o person shall be deprived of life, liberty or property without due process of law.” Art. I, § 9, Fla. Const. The Fifth Amendment to the United States Constitution guarantees the same. As this Court explained in Department of Law Enforcement v. Real Property, 588 So.2d 957, 960 (Fla.1991), “[p]rocedural due process serves as a vehicle to ensure fair treatment through the proper administration of justice where substantive rights are at issue.” Procedural due process requires both fair notice and a real opportunity to be heard. See id. As the United States Supreme Court explained, the notice must be “reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.” Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (citations omitted). Further the opportunity to be heard must be “at a meaningful time and in a meaningful manner.” Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); accord Fuentes v. Shevin, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)....
Keys Citizens for Responsible Gov’t, Inc. v. Fla. Keys Aqueduct Auth., 795 So.2d 940, 948 (Fla.2001). Because R.H.B. did not receive fair notice that the calculation of a temporary child support obligation would occur at the hearing on October 6, 2000, we reverse the order insofar as it set a monthly amount of temporary child support, and we reverse the income deduction order.
Reversed in part and remanded for further proceedings consistent with this opinion.
ALTENBERND, NORTHCUTT and GREEN, JJ., concur.

. Apparently R.H.B. and J.B.W. submitted to a paternity test, resulting in a report indicating a' statistical probability of 99.999% that R.H.B. is the biological father.

. As a practical matter, an order denying a motion to dismiss is not an appealable nonfi-nal order. See Fla. R.App. P. 9.130(a)(3) (listing appealable nonfinal orders but omitting orders denying motions to dismiss); United Servs. Auto Ass’n v. Modregon, 818 So.2d 562 (Fla. 2d DCA, 2002). Even if this court could have considered the appeal of this earlier order to be a petition for certiorari, the petition would have been untimely. See Fla. R.App. P. 9.100(c)(1).

. This holding in Eldridge v. Eldridge, 153 Fla. 873, 16 So.2d 163 (1944), is based upon common law as opposed to statutory right. Indeed, no statute has given the husband and legal father specific standing to pursue such an action. See, e.g., § 742.01, Fla. Stat. (1941) (permitting a single woman to make complaint for bastardy); § 742.011, Fla. Stat. (1975) (permitting any unmarried woman to bring proceedings to determine paternity); § 742.011, Fla. Stat. (2000) (permitting any woman or "any man that has reason to be-Heve he is the father of a child" to bring an action for paternity).

. These facts warrant comparison with those in Privette, where the woman’s legal husband had not cohabited with her for a considerable period. See Chris W. Altenbernd, Quasi-Marital Children: The Common Law’s Failure in Privette and Daniel Calls for Statutory Reform, 26 Fla. St. U.L.Rev. 219, 240 (1999) (citing record in Dep’t of Health & Rehabilitative Servs. v. Privette, No. 90-1521 (Fla. 12th Cir.Ct.1991)).

. Thus these cases suggest that a determination that the biological father is the “father” of a child results in the termination of any rights theretofore held by the husband and legal father. See also Callahan v. Dep’t of Revenue, 800 So.2d 679 (Fla. 5th DCA 2001).