MORRIS, Judge.
C.G. appeals a final judgment entered against him in his paternity action. C.G. is the undisputed biological father of H.G.-R. However, H.G.-R.’s biological mother was married to J.R. at the time of H.G.-R.’s birth, thereby establishing J.R. as H.G.R.’s legal father. After C.G. filed a verified complaint to establish paternity, he and the biological mother entered into a paternity and timesharing agreement, which was then approved by the trial court. That agreement provided both C.G. and J.R. with visitation rights, and J.R. signed the agreement though he was not listed as a party to it. In a subsequent order vacating the agreement, the trial court found that the agreement was unenforceable because it created dual paternity which is not recognized under Florida law. And in the trial court’s final judgment denying the paternity action, the trial court determined that it was in H.G.-R.’s *777 best interests to have J.R. remain as her legal father. We affirm as explained herein.
I. Background
J.R. and the biological mother were married in 1999 and had three children prior to H.G.-R.’s birth. C.G. was also married and had two prior children with his wife. C.G. and J.R. were business partners. In 2005, the biological mother and C.G. began an extramarital affair and the biological mother became pregnant with H.G.-R.[1] Upon learning she was pregnant, the biological mother immediately told C.G. that the child may be his child. However, the biological mother did not immediately inform J.R. of the possible paternity issue and, therefore, J.R. assumed H.G.-R. was his biological child.
As soon as H.G.-R. was born, the biological mother permitted C.G. to have frequent visitation with the child. When the child was seven months old, the biological mother finally informed J.R. that C.G. might be the child’s biological father.
In May 2007, J.R. and the biological mother stopped permitting visitation between C.G. and H.G.-R. C.G. then filed a paternity action. C.G. did not have visitation with the child between February 1, 2008, and January 31, 2009.
In January 2009, the biological mother and J.R. separated. That same month, C.G. and the biological mother entered into a paternity, support, and other related relief agreement, wherein it was acknowledged that C.G. was the “legal, natural[,] and biological father” and that he would have “liberal and reasonable visitation” with the child. The agreement required C.G. to pay child support and half of all insurance deductibles and medical expenses not covered by the insurance policy. Although the agreement specified that it was only between C.G. and the biological mother, it contained a stipulation that: “[tjhis agreement in no way removes any parental rights of [J.R.] as to custody or visitation with [H.G.-R.], according!] to Florida State Law ... or further order of the Court.” J.R. signed the agreement after C.G. and the biological mother. The trial court entered a final order acknowledging the agreement in February 2009, although the order did not mention the clause pertaining to J.R.’s parental rights.
A dispute arose after the biological mother was arrested for drug possession and C.G. refused to return the child after lawful visitation, citing concerns about drug usage by the biological mother and J.R. Eventually, H.G.-R. was returned to the biological mother pursuant to an emergency pick up order. J.R. then filed a verified motion to set aside and/or vacate the January 2009 agreement and the February 2009 final judgment addressing that agreement.
C.G. and the biological mother subsequently entered into a “post paternity custodial residential parent, time sharing [sic] plan for minor child, support!,] and other related relief agreement.” In that agreement, the biological mother acknowledged C.G.’s parental rights while at the same time releasing J.R. “from any financial responsibilities of [H.G.-R.].” The agreement provided for equal timesharing between C.G. and- the biological mother, for child support and daycare expenses to be paid by C.G., and for C.G. to pay half of the insurance deductibles and medical expenses not covered by insurance. There *778 was no mention of J.R.’s parental rights in this agreement, and J.R. did not sign it.
The biological mother, her boyfriend, and H.G.-R. then moved in with C.G. and his family. The biological mother filed for divorce from J.R. in June 2009, but the action was dismissed for lack of prosecution in October 2010. In the interim, the trial court adopted the rotating custody agreement entered into by C.G. and the biological mother. The trial court agreed to accept the new agreement on a temporary basis and permitted J.R. to pursue his then-pending motion to set aside and/or vacate the earlier agreement and final judgment.
In October 2009, the trial court entered an order vacating the final judgment on the original parenting, support, and time-sharing agreement and removing H.G.-R. from C.G.’s care. The basis for the trial court’s decision was that the January 2009 agreement and final judgment thereon created a “legal fiction of dual paternity” that was contrary to state law and public policy, thereby rendering it unenforceable. Subsequent to entry of the October 2009 order, the biological mother placed H.G.-R. with J.R.[2] C.G. has not seen the child since October 2009.
In July 2011, C.G. filed a verified emergency motion for timesharing, modification of timesharing, and sole and/or shared custodial responsibility of H.G.-R. on the basis that DNA tests revealed that he was the child’s biological father and that he had been involved in the child’s life. He also noted that the biological mother was unstable and a drug user. The motion was denied, but the matter was set for trial.
In February 2012, a guardian ad litem (GAL) was appointed in the proceeding.[3] In March 2012, she presented her written report to the court. In evaluating what was in the best interest of H.G.-R., the GAL primarily considered C.G. and J.R. as placements because the biological mother had not had any contact with the child for over two years. The GAL determined that due to the biological mother’s instability and drug use, she was not a suitable placement for the child, and between the two fathers, she concluded it was in the child’s best interest to be placed with J.R. In reaching this conclusion, the GAL faulted C.G. for allowing the biological mother to reside in his home with her then-boyfriend while she continued to abuse drugs and for using the media and street signs to publicize the custody issue. The GAL concluded that C.G. entered into the parenting, support, and timesharing agreement in order to gain an advantage in the custody battle. Regarding the fathers’ moral fitness, the GAL noted C.G.’s decision to use public forums to convey information about the issue and his interference with the biological mother’s and J.R.’s efforts to reconcile their marriage. The GAL also expressed concern that C.G. had been untruthful in regard to an alleged incident of medical neglect of the child as well as making false accusations regarding J.R.’s purported attempt to purchase drugs.
The GAL believed that J.R. was better equipped to facilitate timesharing based on C.G.’s unilateral decision to modify the timesharing agreement (i.e., when he refused to return H.G.-R. after visitation); the GAL noted that J.R. had been more cooperative with the timesharing schedule. *779 The GAL also found that H.G.-R. was doing well in her placement with J.R. and that the child considered J.R. to be her father. H.G.-R. was closely bonded with her half-siblings, and the half-siblings were protective of her. On that basis, the GAL believed it would be detrimental to separate H.G.-R. from her half-siblings. The GAL believed that the home, school, and community record favored placement with J.R., and she credited J.R. for his influence in the child’s life.[4] The GAL also expressed concern that the child’s placement with C.G. could be challenged in court as not permissible under Florida law. The GAL ultimately concluded that it was in H.G.-R.’s best interest to preserve the “presumption of legitimacy” that arose when she was born during an intact marriage.
Ultimately, the trial court entered a final judgment against C.G. in his paternity action. In so ruling, the trial court largely agreed with the GAL’s conclusions, noting especially H.G.-R.’s relationship with her half-siblings and C.G.’s use of public forums to publicize the matter. The trial court also found that despite C.G.’s status as the biological father, “[h]e has no significant relationship with [H.G.-R.].” The trial court found that many of the child custody factors set out in section 61.13(3), Florida Statutes (2012), favored placement with J.R. and that none favored placement with C.G. The trial court ruled that it was in H.G.-R.’s best interest for J.R. to “remain as her legitimate and legal father,” and the trial court ordered that the child’s birth certificate reflect that J.R. was the father.
II. Analysis
C.G. appeals the October 2009 order that vacated the earlier order approving the original paternity and timesharing agreement; he also appeals the final judgment denying his paternity complaint. Initially, we reject C.G.’s argument that there was insufficient evidence to support the trial court’s determination that it was in H.G.-R.’s best interest for J.R. to remain recognized as her legitimate and legal father. Instead, we conclude that based on the factors set forth in section 61.13(3), the trial court’s decision to award custody to J.R. and to deny C.G.’s paternity action was supported by competent, substantial evidence. Thus we affirm the final judgment denying C.G.’s verified complaint to determine paternity without further comment.
However, we write to explain why we also affirm the October 2009 order vacating the February 2009 order on the original paternity and support agreement. In vacating the original paternity and timesharing agreement, the trial court found that the concept of dual paternity was a “legal fiction” that was contrary to state law and public policy. The issue is whether a child can have two legally recognized fathers in addition to a mother. Because this is an issue of law, we review the trial court’s decision under a de novo standard of review. See P.G. v. E.W., 75 So.3d 777, 780 n. 1 (Fla. 2d DCA 2011).
We acknowledge two Florida cases wherein the courts determined that Florida law permits a child to have two mothers or two fathers. See Greenfield v. Daniels, 51 So.3d 421 (Fla.2010); T.M.H. v. D.M.T., 79 So.3d 787 (Fla. 5th DCA 2011), approved in part, disapproved in part, 129 So.3d 320 (Fla.2013).
In T.M.H., two women involved in a romantic relationship were involved in a *780 custody dispute. One of the women gave birth to a child who was conceived using donor sperm and the other woman’s egg. 79 So.3d at 788-89. The two women raised the child for several years before their relationship deteriorated. Id. at 789. The Fifth District Court of Appeal was required to interpret the term “donor” as used in section 742.14, Florida Statutes (2009). Because no statutory definition was provided, the court relied on case law in holding that the woman who provided the egg to conceive the child was not considered a “donor” under section 742.14 and, therefore, that she did not surrender her parental rights to the child as would a “donor” contemplated by the statute. Id. at 791-94. The court rejected the argument that other statutory chapters applied to foreclose the parental- rights of the woman who donated her egg, finding that “[cjhapter 742, entitled ‘Determination of Parentage,’ is the statutory vehicle by which paternity is established for children born out of wedlock.” Id. at 794. The court concluded that both women had parental rights to the child. Id. at 803.
On review, the Florida Supreme Court disagreed with the Fifth District that section 742.14 did not apply to the facts of the case. Further, the court concluded that section 742.14 was unconstitutional as applied to the wbman who provided the egg because it would deprive her — the biological mother — of parental rights “where she was an intended parent and actually established a parental relationship with the child.” 129 So.3d at 327, 2013 WL 5942278 at *20. In so concluding, the court noted the sanctity of the parent-child biological connection and recognized that “ ‘[w]hen an unwed [biological] father demonstrates a full commitment to the responsibilities of parenthood by com[ing] forward to participate in the rearing of his child,’ ” the father’s inchoate constitutional right develops into a fundamental right. Id. at 335, at *9 (alteration in original) (quoting Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983)). The court explained that the same principle applied to the woman who provided the egg and that, therefore, the woman had a protected fundamental right to be a parent to her child. Because there had been no showing of a compelling government interest to deprive the biological mother of her fundamental right to be a parent, the statute was unconstitutional as applied.
We acknowledge the Florida Supreme Court’s emphasis on the protection of a biological parent’s right to parent their child where that parent has demonstrated “ ‘a full commitment to the responsibilities of parenthood.’ ” Id. at 335, at *9 (quoting Lehr, 463 U.S. at 261, 103 S.Ct. 2985). And it is clear that C.G. demonstrated such a commitment in this case. However, the facts in T.M.H. are not the facts in this case. The holding in T.M.H. was based on a narrow interpretation of chapter 742 as applied to the conception of a child between two unmarried women and the use of one woman’s eggs to impregnate her partner. That situation is not present in this case. And this case involves a factor that T.M.H. does not: the child was born into a legally intact marriage. Thus, T.M.H. does not control the disposition here.
Greenfield concerned a minor’s standing to maintain a wrongful death action pursuant to chapter 768, Florida Statutes. The issue in that case was framed as whether a survivor’s claim could be brought on behalf of a child who was alleged to be the decedent’s biological child but whose biological mother had been married to another man at the time of the child’s conception and birth. 51 So.3d at 422-23. The Florida Supreme Court looked at the legislative intent behind section 768.18(1), Florida Statutes (2005), and found that the legisla *781 ture intended for the statute to be liberally construed to shift losses from the survivors to the wrongdoer. Id. at 426. Finding that a formal determination of paternity under chapter 742 was not required for purposes of maintaining a wrongful death action, the court ultimately held that “the biological child of a man not married to the mother may claim survivor damages in a wrongful death action so long as it is established that the decedent is the biological parent and that he acknowledged responsibility for support.” Id. at 427.
But as with T.M.H., the facts in Greenfield are not the facts of this case. This is not a wrongful death action brought pursuant to chapter 768. Rather, this is simply a case wherein the biological mother— while married to her husband — became pregnant by another man and wherein both fathers claim parental rights to the child.
The fact that C.G.’s DNA test results established that he was H.G.-R.’s biological father is “legally insignificant” for purposes of establishing parental rights. See Slowinski v. Sweeney, 117 So.3d 73, 78 (Fla. 1st DCA 2013). “The Florida Supreme Court has defined the ‘legal father’ as the man to whom the mother was married when the child was born and whose name appears on the birth certifícate.... ” Id. (citing Dep’t of Health & Rehabilitative Servs. v. Privette, 617 So.2d 305, 307 (Fla.1993)). “Florida does not recognize ‘dual fathership’ [and, therefore] [o]nly one man may be designated the child’s ‘legal father’ (with the rights and responsibilities thereof) at any given time.” Id. (citing R.H.B. v. J.B.W., 826 So.2d 346, 350 (Fla. 2d DCA 2002),[5] and G.F.C. v. S.G., 686 So.2d 1382 (Fla. 5th DCA 1997)).
In G.F.C., the court was tasked with deciding whether a trial court properly dismissed a biological father’s petition to establish paternity where the child was born during the biological mother’s intact marriage to a man who was not the biological father. The court noted that at common law, a child born during an intact marriage was presumed to be the child of the man to whom the biological mother was married and that the common law presumption of legitimacy remained. 686 So.2d at 1384 (citing Privette, 617 So.2d at 307).[6] The court noted that section *782 742.10 provided the proper procedure for determining paternity for “children bom out of wedlock ” and that section 742.011 provided that paternity proceedings could be initiated only where paternity had not already been established “by law or otherwise.” Id. at 1385 (quoting §§ 742.011, 742.10). The court explained that “[p]a-ternity would ‘otherwise’ be established when a child is born to an intact marriage and recognized by the husband and the mother as being their child.” Id. Thus, according to the court, “Chapter 742 does not afford [a biological father] the statutory right to sue for paternity [where] the child in question ... was not born ‘out of wedlock’ and the paternity of the child had been ‘otherwise’ established.” Id.
Similarly here, H.G.-R. was born during the biological mother’s intact marriage to J.R. Although the biological mother and J.R. were separated at the time of the final hearing, they were still married. And pri- or to the January 2009 agreement, the birth certificate reflected that J.R. was H.G.-R.’s father. Consequently, the child was not born out of wedlock and paternity had been otherwise established. Thus, the presumption of legitimacy applied in this case. We acknowledge that the birth certificate was amended to reflect that C.G. was H.G.-R.’s father pursuant to the January 2009 agreement. However, J.R. was not a formal party to that agreement, he was not represented by counsel during the signing of the agreement, and he was not asked whether he agreed with the terms. Rather, J.R. testified that he signed the agreement because he “felt backed into a corner” and that he believed that it was the only way he could continue to have visitation with H.G.-R.[7]
This is not a case where either the biological father or the legal father has abandoned the child. Nor is this a case where either father failed to demonstrate a strong desire to be a part of the child’s life or even the ability to care for the child. Rather, this is one of those cases presenting the unfortunate circumstance of a child who was born into a legally intact marriage but who was conceived as the result of an extramarital affair. The consequence of that circumstance is that the third party, here C.G., has an interest in that child which is adverse to the legal father, here J.R. We are cognizant of the gravity of our decision and the legal ramification that it has on C.G.’s and H.G.-R.’s relationship. However, under the facts of this case, there is simply no support in Florida law for the proposition that H.G.R. is entitled to have two legally recognized fathers. Because similar circumstances could arise in other cases, the legislature may choose to readdress the issue of a biological father’s right to establish paternity where the child is conceived and born during an intact marriage to another man. But under the current state of the law, we are constrained to affirm the trial court’s order vacating the February 2009 order approving the original paternity and support agreement.
Affirmed.
KELLY and SLEET, JJ., Concur.

. C.G.'s affair with the biological mother had already been discovered by J.R. prior to H.G.R.’s conception. J.R. confronted C.G. about the affair, and C.G. agreed to end it. However, the affair continued until May 2007.

. At some later point in time, J.R. began a relationship with another woman. At the time of the March 2012 final hearing, J.R.’s girlfriend and her son were living with J.R., H.G.-R., and J.R.’s other children.

. This was the second GAL appointed in the case. The first GAL was involved in making the recommendation about whether the DNA test should be conducted.

. At the March 2012 final hearing, the biological mother also expressed her desire to have H.G.-R. remain with J.R.

. In R.H.B., this court dealt with the issue of whether a biological father’s due process rights were violated when a temporary child support order was entered against him without proper notice. 826 So.2d at 347. The child in that case was conceived and born at a time when the biological mother was married to a man, P.W., who was not the biological father. Id. In fact, at the time of appeal, the biological mother and P.W. were still married and maintained a traditional family relationship. Id. On those facts, we concluded that "P.W. is the legal father of this child." Id. Although the case was decided on tire due process issue, we discussed the history of case law pertaining to "quasi-marital children,” those children who are born during an intact marriage, but who have a third-party as one of their biological parents. See id. at 348-50. We noted that the Fifth District had previously held that "there is no such thing as 'dual fathership,' ” and we explained that the common theme in the case law was that the emphasis was on the child’s best interest, especially "the child’s interest in legitimacy and stability.” Id. at 350 (citing Achumba v. Neustein, 793 So.2d 1013 (Fla. 5th DCA 2001), disapproved on other grounds by Greenfield, 51 So.3d at 422; G.F.C., 686 So.2d 1382).

. Privette dealt with the issue of whether a putative father could be ordered to submit to a blood test for purposes of establishing his child support obligation, an issue that is not relevant to this case. However, Privette has been widely cited on the issue of the presumption of legitimacy that arises when a child is born during an intact marriage and the substantial burden that a biological father has in overcoming such a presumption. We note that chapter 742 now permits the presump *782 tion to be rebutted. See P.G., 75 So.3d at 782-83 (discussing statutory change).

. We acknowledge that there was also record evidence that at the time of signing the agreement, J.R. agreed that he had not been coerced and that he was signing the agreement freely and voluntarily. However, this does not take away from the facts that he was not a formal party to the agreement and that he was not asked if he agreed with the terms.