# Third District Court of Appeal

## State of Florida

Opinion filed December 3, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D25-1239
Lower Tribunal No. 22-20020-FC-04
_____

**Laura Rosich-Medina, et al.,**
Petitioners,

vs.

**Christian Cerqueda Chilaud,**
Respondent.

A Writ of Certiorari to the Circuit Court for Miami-Dade County, Diana Vizcaino, Judge.

Crabtree & Auslander, and John G. Crabtree, Charles M. Auslander, and Brian C. Tackenberg, for petitioners.

Nancy A. Hass, P.A., and Nancy A. Hass (Hollywood); Abramowitz and Associates, and Jordan B. Abramowitz, for respondent.

Before LOGUE, LINDSEY, and BOKOR, JJ.

LOGUE, J.

Petitioners Laura Rosich-Medina ("the mother") and William Coleman ("the putative legal father") petition for a writ of certiorari quashing an order obtained by Respondent Christian Cerqueda Chilaud ("the putative biological father") requiring the mother and the child to submit to a genetic test to determine the paternity of the child. This case involves the law's methods to establish and challenge determinations of legal paternity when the mother and father are unwed.

## BACKGROUND

The child at the center of this dispute was born to the mother in 2018 in another state. According to the verified filings of the mother and the putative legal father, in the time leading up to the child's birth, she was in a relationship with the putative legal father. Further, he was present in the delivery room when the child was born. The next day, the mother and the putative legal father executed a voluntary acknowledgment of paternity before a notary using the forms and following the procedures required in the state of birth, and he was then named as the child's father on the birth certificate. Since then, he has acted as the child's only father, supporting the child both financially and emotionally. In March 2022, they moved with the child to Florida.

In June 2023, over four years after the child was born, the putative biological father filed the proceeding below which ultimately generated his "amended verified petition to establish paternity, a parenting plan, time sharing, child support and other relief" under Chapters 742 and 61 of the Florida Statutes. The petition named both the mother and putative legal father as respondents. In it, the putative biological father averred he had a sexual relationship with the mother in the time before the child was born that resulted in the pregnancy and birth of the child. The mother admitted the sexual relationship, but denied it resulted in the pregnancy and birth of the child.

The putative biological father averred his romantic relationship with the mother ended in 2020, around two years after the birth of the child, but she prevented him from establishing a relationship with the child. He ultimately "returned to reside in Europe and, since that time, has had very limited contact with the minor child," but has deposited an unstated amount of money in a Spanish bank account owned by the mother.

The putative biological father now seeks to participate in rearing the child from his home in Europe. In that regard, the petition requested the trial court establish a parenting plan, pro rata child support, change the name of

3

the child to include his name, change the child's birth certificate, and grant him an award of attorney's fees if the mother litigates in a vexatious manner.

During litigation, the putative biological father filed a motion under section 742.12(2), Florida Statutes, for paternity testing of himself and the child. The basis of his motion was essentially that he had filed a sworn declaration that because of a sexual relationship with the mother, he is the biological father of the child and "wishes to be an active and involved parent, participating in the rearing of the child." He also requested attorney's fees relating to the motion. The mother and the putative legal father filed a verified opposition.

The trial court granted the putative biological father's motion. The trial court accepted the putative biological father's argument that he was entitled to the testing on the basis that his claim of biological parentage was sufficient to place the matter in controversy. The trial court did not determine whether the putative legal father qualified as the legal father. The trial court acknowledged but distinguished Department of Health & Rehabilitative Services v. Privette, 617 So. 2d 305, 309 (Fla. 1993). Privette held that a party seeking paternity testing of a child who already has a father established by law must show the paternity test is in the best interest of the child – not merely that the test might establish a biological link. Here, the trial court,

4

however, reasoned that <u>Privette</u>'s requirement of the best interest of the child applied only where the legal father's paternity was established by the child being born into an "intact marriage" because the standard was meant to protect the child's legitimacy.

The mother and the putative legal father timely petitioned this Court for a writ of certiorari, seeking to quash the order.

## STANDARD OF REVIEW

"[A] party seeking review through a petition for writ of certiorari must demonstrate: (1) a material injury in the proceedings that cannot be corrected on appeal (sometimes referred to as irreparable harm); and (2) a departure from the essential requirements of the law." <u>Nader v. Fla. Dep't of Highway Safety & Motor Vehicles</u>, 87 So. 3d 712, 721 (Fla. 2012) (citation modified). Irreparable harm exists if a party is wrongfully forced to submit to a paternity test. <u>Llanos v. Huerta</u>, 296 So. 3d 472, 474 (Fla. 3d DCA 2018). A departure from the essential requirements of law occurs "when there has been a violation of a clearly established principle of law resulting in a miscarriage of justice." <u>Nader</u>, 87 So. 3d at 722 (quoting <u>Combs v. State</u>, 436 So. 2d 93, 96 (Fla. 1983) (emphasis added in <u>Nader</u> omitted)). Clearly established law "can derive from a variety of legal sources, including recent controlling case law,

5

rules of court, statutes, and constitutional law." <u>Allstate Ins. Co. v. Kaklamanos</u>, 843 So. 2d 885, 890 (Fla. 2003).

**ANALYSIS**

**I.**

The mother and the putative legal father first argue that the proceedings below departed from the essential requirements of law because the paternity test was ordered even though the putative biological father failed to establish that a paternity test was in the best interest of the child. The putative biological father responds that he was not required to show that the test was in the best interest of the child because the child was not born into an intact marriage. We are not persuaded by the argument of the putative biological father.

Florida has long had a common-law rule that a party seeking an order to conduct a paternity test of a child who already has a legal father must establish that the test would serve the child's best interest. The Fifth District for example recognized "the strong Florida public policy that . . . DNA tests to establish that a man other than the legal father of a child is the biological father will not be ordered unless the court determines that it is in the best interest of the child." <u>Callahan v. Dep't of Revenue ex rel. Roberts</u>, 800 So. 2d 679, 680 (Fla. 5th DCA 2001). <u>See also</u> <u>Allison v. Medlock</u>, 983 So. 2d

6

789, 791 (Fla. 4th DCA 2008) (same); Dep't of Revenue ex rel. T.E.P. v. Price, 958 So. 2d 1045, 1046 (Fla. 2d DCA 2007) (same).

Indeed, "no party to any family law proceeding is entitled to an order requiring another party to submit to genetic testing unless (1) the proceedings place paternity 'in controversy' and (2) 'good cause' exists for the testing." State, Dep't of Revenue ex rel. Chambers v. Travis, 971 So. 2d 157, 162 (Fla. 1st DCA 2007) (issuing a writ of certiorari to quash an order requiring a paternity test and holding the legal father of a child who signed voluntary acknowledgment of paternity did not establish "good cause" because his reason for seeking paternity testing was "to be sure" that he was the biological father).

This heightened standard for such genetic testing in this context was first announced in Privette, which involved an attempt by the Department of Health to obtain a paternity test of a putative biological father when the father of a child born in wedlock allegedly failed to financially support the mother and child. Before ordering a paternity test where the child already has a legal father, the Florida Supreme Court held, a trial court must require the party seeking the paternity test to prove by "clear and convincing evidence" that the test is in the child's best interest – not merely that the test might establish

a biological link.[1] <u>Privette</u>, 617 So. 2d at 308. As the Court recognized, the burden on the movant in such cases "is substantially greater than would apply in any other discovery context." <u>Id.</u>

Privette concerned a situation in which the father's legal paternity was established by being married to the child's mother. We do not read its protections as extending only to children whose parents are married. While the opinion refers in passing to "the stigma of illegitimacy," <u>id.</u> at 309, the opinion repeatedly emphasized that "a guiding principle that must inform every action of the courts in this sensitive legal area," is "the policy of protecting the welfare of the child, i.e., the policy of advancing the best interests of the child." <u>Id.</u> at 307. In discussing the best interest of the child, <u>Privette</u> expressed concern with the harm that results from introducing uncertainty in a child's family life:

> It is conceivable that a man who has established a loving, caring relationship of some years' duration with his legal child later will prove not to be the biological father. Where this is so, it seldom will be in the children's best interests to wrench them away from their legal fathers and judicially declare that they now must regard strangers as their fathers. <u>The law does not require such cruelty toward children</u>.

---

[1] The caselaw, by the way, has consistently held "an allegation of a mere biological link to the child would not suffice. Otherwise, in an extreme example, a man could be permitted to assert a cause of action for paternity of a child conceived as a result of a sexual battery." <u>G.F.C. v. S.G.</u>, 686 So. 2d 1382, 1386 (Fla. 5th DCA 1997).

8

Id. at 309 (emphasis added). Privette, therefore, is properly understood as being based on the child's best interest in securing the emotional and financial support provided by stable family relationships. "All of this has important consequences," as the Supreme Court said in Privette, "in deciding whether a blood test will be permitted in the first instance." Id.

Like its rationale, the rule announced in Privette is not limited to protecting the sanctity of only one type of legally established family relationship. Indeed, our Court has applied Privette to quash an order requiring paternity testing of a child born out of wedlock with a legal father whose paternity was established by a written acknowledgement, which the birth mother later attempted to challenge. Flores v. Sanchez, 137 So. 3d 1104 (Fla. 3d DCA 2014). In Flores, we cited and quoted from Privette while holding, "[a]t this point, even if it were determined that the alleged biological father is in fact the Child's biological father, it most likely will not be in the Child's best interests to disestablish Mr. Flores' paternity and have the alleged biological father named as the Child's father on her birth certificate as requested by the Mother." Id. at 1112.

Applying this law here, before granting the putative biological father's motion for paternity testing, the trial court was required to determine whether he had established that the child had no legal father. If the child has a legal

9

father, "[p]rior to ordering paternity testing, the trial court must also determine that the testing would be in the child's best interest." Id. at 1107–08. The proceedings below did not address either of these points. As an appellate court, we are constrained from making these determinations in the first instance. Tucker v. Ebadian, 338 So. 3d 384, 385–86 (Fla. 3d DCA 2022) ("An appellate court should not ordinarily decide issues not ruled on by the trial court in the first instance." (internal quotation marks and citation omitted)). For these reasons, we issue the writ and quash the order under review.

## II.

The mother and the putative legal father also argue that the proceedings below departed from the essential requirements of law because the paternity test was ordered even though the putative biological father failed to allege and prove the elements necessary to bring a challenge to the putative legal father's paternity under Chapter 742 of the Florida Statutes. Because we have set forth a ground for quashing the decision under review, we will not address this second issue at length. We note, however, that this issue also turns on whether the child already has a legal father. "[Where a child has a legal mother,] Florida does not recognize dual fathership and, therefore only one man may be designated the child's legal father (with the

10

rights and responsibilities thereof) at any given time." <u>C.G. v. J.R.</u>, 130 So. 3d 776, 781 (Fla. 2d DCA 2014) (citation modified).[2]

Chapter 742's general provision for establishing paternity for a child born out of wedlock is not available when the child already has a legal father. § 742.011, Fla. Stat. (2025) ("Any woman who is pregnant or has a child, any man who has reason to believe that he is the father of a child, or any child may bring proceedings in the circuit court, in chancery, to determine the paternity of the child <u>when paternity has not been established by law or otherwise</u>." (emphasis added)); <u>Dep't of Revenue ex rel. T.E.P.</u>, 958 So. 2d at 1047 (Villanti, J., specially concurring) ("Because paternity had previously been established and Mr. Price did not properly bring a proceeding to challenge that establishment of paternity, the law suit below did not involve an action to establish paternity. Under these facts, the trial court did not have authority to order DNA testing.").

And Chapter 742's provision for challenging the paternity of a child with a legal father based on an acknowledgment of paternity requires, after expiration of sixty days, proof of "fraud, duress, or material mistake of fact, with the burden of proof upon the challenger." § 742.10(4), Fla. Stat. (2025).

---

[2] <u>Cf. Fla. Dep't of Child. & Fams. v. In re Adoption of X.X.G.</u>, 45 So. 3d 79, 81 (Fla. 3d DCA 2010).

See J.A.I. v. B.R., 160 So. 3d 473, 474 (Fla. 2d DCA 2015) (quashing order directing genetic testing to establish paternity of child born out of wedlock because legal father executed acknowledgment of legal paternity which was not challenged within 60 days and therefore putative biological father had to prove "fraud, duress, or material mistake of fact" as required by section 742.10(4)); Bauer v. Carlson, 408 So. 3d 155, 159 (Fla. 5th DCA 2025); Bronner v. Longden, 398 So. 3d 1015, 1019 (Fla. 4th DCA 2024) ("We reverse the order of dismissal and remand to the circuit court to hold an evidentiary hearing on the mother's claim that the acknowledgment of paternity should be voided due to fraud, duress, or material mistake of fact. At such a hearing, the burden of proof shall be on the mother to establish the facts that would negate Bronner's status as the legal father. See § 742.10(4), Fla. Stat. (2017)."). See also § 742.105, Fla. Stat. (2025) (providing not only a "final order of paternity entered in a foreign jurisdiction" but also "an affidavit acknowledging paternity signed in any other state according to its procedures, shall be given the same legal effect as if such . . . affidavit was signed pursuant to this chapter.").

Petition granted; order quashed.

12